Cornelius COOPER, Michael Edwards, Charcella Green, Patricia Harris, Sarah Jean Harris, Irene McCullers, and Carolyn Wilson, Individually and as Class Representatives, Plaintiffs,

v.

SOUTHERN COMPANY, Georgia Power Company, Southern Company Services, Inc., and Southern Company Energy Solutions, Inc., Defendants.

Civ.A. No. 1:00–CV–2231–ODE.

United States District Court,
N.D. Georgia,
Atlanta Division.

Oct. 11, 2001.

R. Lawrence Ashe, Jr., Nancy E. Rafuse, Susan Elisabeth Himmer, Paul, Hastings, Janofsky & Walker, Atlanta, GA, for movant.

Michael B. Terry, Joshua F. Thorpe, Steven Rosenwasser, Bondurant, Mixson & Elmore, Atlanta, GA, J. Keith Givens, Angela Joy Mason, Cochran, Cherry, Givens & Smith, Dothan, AL, Hezekiah Sistrunk, Jr., Cochran, Cherry, Givens, Smith & Sistrunk, Atlanta, GA, Jock Michael Smith, phv, Cochran, Cherry, Givens & Smith, Tuskegee, AL, Johnnie L. Cochrane, Jr., phv, Cochran, Cherry, Givens & Smith, Los Angeles, CA, for plaintiffs.

W. Ray Persons, King & Spalding, Atlanta, GA, Richard Gerakitis, Stephen William Riddell, Charles A. Hawkins, Frederick Cobb Dawkins, Ashley Zeiler Hager, Sheldon W. Snipe, Troutman Sanders, Eric Jon Taylor, Walter Christopher Arbery, Kelly D. Ludwick, Hunton & Williams, Atlanta, GA, for defendants.

### *ORDER*

EVANS, District Judge.

This putative class action alleging discrimination in employment based on race in viola-

tion of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, and 42 U.S.C. § 1981 ("Section 1981") is presently before the Court on Plaintiffs' motion for class certification. The motion includes a request for an evidentiary hearing.

Both sides have filed designations of the evidence they would present if an evidentiary hearing were held. The Court has reviewed the designations, and finds the referenced evidence is already substantially included in the voluminous record, including appendices of documents, affidavits and deposition excerpts which have been reviewed by the Court. An evidentiary hearing is not needed. Thus, Plaintiffs' request for an evidentiary hearing is DENIED.

After reviewing the record and the briefs filed by both sides, Plaintiffs' motion for class certification is DENIED for the reasons stated below.

## TABLE OF CONTENTS

I    Introduction ...................................................... 598

II   The Defendants ................................................... 599

III  The Named Plaintiffs ............................................. 602

IV   Standing ......................................................... 605

V    Allegations of Class Wide Discrimination As Set Forth in the Complaint .......... 606

VI   Evidence Relied Upon by Plaintiffs to Obtain Class Certification ................ 607

VII  Legal Standards .................................................. 607
     1.  Rule 23(a) ................................................... 608
         A.  Numerosity ............................................... 608
         B.  Commonality and Typicality under Rule 23(a)(2–3) ....................... 608
             1.  Typicality ............................................ 609
             2.  Commonality ........................................... 610
                 a.  Murphy Report ..................................... 611
                 b.  Madden Report ..................................... 611
                 c.  Noose Evidence .................................... 615
                 d.  Racial Slurs and Jokes ............................ 619
                 e.  Glass Ceiling ..................................... 619
                 f.  Alleged Policy of Ignoring Policies ............... 619
                 g.  Prospective Class Members' Affidavit Establishing their Own Experience With Defendants ........................... 620
                 h.  Indifference of Senior Management ................. 625
                 i.  Legal Discussion .................................. 625
         C.  Adequacy of Representation ............................... 627
     2.  Rule 23(b)(2) ................................................ 627
     3.  Rule 23(b)(3) ................................................ 629
     4.  Hybrid Certification ......................................... 631

VIII SUMMARY .......................................................... 631

## I. INTRODUCTION

This is an action brought by seven present or past employees of the various Defendants seeking to represent a class of all African–American employees of Defendants, including upper and middle management level employees, office and clerical staff, commission-paid sales personnel, and unionized operations, maintenance and construction personnel.

Pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs request certification of the following class:

All African–American persons employed by Southern Company's Corporate Office, Georgia Power Company, Southern Company Services, Inc. or Southern Company Energy Solutions, Inc., in the United States at any time from July, 1998 to the

present, who are subject to the Defendants' employment, personnel and human resources policies and practices and who have been, continue to be, or may in the future be adversely affected by the Defendants' racially discriminatory employment policies and practices ("the Class").

(Plaintiffs' motion for class certification, pp. 1–2; Complaint). The proposed class encompasses approximately 2,400 people.

Plaintiffs' Third Amended Complaint ("Complaint") alleges discrimination in promotions compensation, training and evaluations, and requests back pay, compensatory damages, punitive damages, declaratory relief,[1] and injunctive relief.[2] The Named Plaintiffs allege various acts of racial discrimination by Defendants at Defendants' locations in the metropolitan Atlanta, Georgia area. The prospective class members reside in Georgia, Alabama, Florida, and Mississippi.

## II. THE DEFENDANTS

Defendant Southern Company ("TSC") is a holding company which owns the stock of all other Defendants named in the complaint. TSC has no employees. (Womack Aff., ¶ 9).[3] Plaintiffs allege that TSC has 26,000 employees in the United States; presumably this was the number of individuals employed by TSC's subsidiaries in the United States when the complaint was filed.

Defendant Georgia Power Company ("GPC") is the largest subsidiary of Defendant Southern Company and is the nation's largest generator of electricity. (Complaint, ¶ 17). It serves customers in 153 of Geor-

gia's 159 counties. It employs approximately 9,000 employees at different locations throughout Georgia. GPC's headquarters is in Atlanta, Georgia. GPC is divided into five business units: (1) Customer Operations; (2) Marketing; (3) Finance; (4) External Affairs (including Governmental and Regulatory Affairs, Community and Economic Development, Environmental Affairs, Land Management, Risk Management and Public Relations); and (5) Corporate Relations. *Id.* at ¶¶ 9–20. GPC also has employees working in GPC's fossil fuel, hydroelectric and nuclear power generating plants which are operated by Southern Company Generation ("SCG").[4] The majority of GPC's employees work in generating plants throughout the state of Georgia.

GPC has a collective bargaining agreement ("CBA") with the International Brotherhood of Electrical Workers ("IBEW"), Local No. 84, which covers forty-four percent of its employees. Over two-thirds of GPC's union workforce is in maintenance/construction or in operations. Fifteen percent of GPC's employees covered by the CBA have college degrees. About twenty-two percent of the covered employees are African–American.[5]

Defendant Southern Company Services ("SCS") has contracted with TSC and each of its subsidiaries to furnish human resources and EEO functions for them. SCS employs approximately 3,000 employees in Georgia and Alabama. SCS is not unionized. (Lightfoot, ¶ 14).[6] Eighty-four percent of SCS' employees are in positions exempt from the requirements of the Fair Labor Standards Act. Seventy-five percent of SCS' exempt employees hold college degrees. Thirty-six

---

1. The Complaint seeks a declaration that "Defendants' acts and practices as set forth herein are in violation of the laws of the United States."

2. The Complaint requests "preliminary and permanent injunctive relief to end Defendants' discriminatory practices and to prevent current and future harm to the Named Plaintiffs and the Class."

3. Christopher Womack is the Senior Vice President of Human Resources for Defendant Southern Company Services, Inc. ("SCS").

4. SCG is an independent business unit of TSC which has a sub-organization for each operating

company. SCG manages the generation of electricity at GPC's generating plants. All employees working at those plants are employees of GPC, but they are supervised by SCG managers.

5. Plaintiffs' brief, p. 12, states that about one-half of Defendants' covered workforce is African–American, citing Plaintiffs' Exhibit 21. This appears to be an incorrect interpretation of the Exhibit. According to the report of Dr. Haworth, p. 11, 21.9% are African–American. Either way, a substantial part of the class Plaintiffs seek to have certified is covered by the CBA.

6. Henry Lightfoot is the Manager of Labor Relations at Defendant GPC.

percent of the exempt employees hold engineering degrees and twenty-four percent have graduate degrees.

Defendant Southern Company Energy Solutions ("SCES") is a non-regulated, non-utility subsidiary of Defendant TSC which develops and sells energy-related products and services. At the time the instant suit was filed, SCES had approximately 268 employees in Georgia, Alabama, Florida, and Mississippi. (Haworth Aff., ¶ 8).[7] Fifty-three percent of SCES' employees are in exempt positions. Most of SCES' employees sell energy-related products and are commission paid.

The Defendants maintain a common job, salary, or pay grade system[8] which was formulated by Defendant SCS for non-exempt employees (grades NE1 through NE9) and exempt employees (grades E1 to E15). Salaries for covered employees are determined by the CBA.

The record contains information concerning the range of salaries payable under different exempt and non-exempt salary grades. *See* Plaintiff's Exhibit 72. The CBA contains the salary designations for bargaining unit jobs. *See* Lightfoot Aff., Exhibit C. In 1998, grade E5 ranged from $42,396 to $67,837. Grade E3 was approximately $34,020 to $54,432. According to David Ratcliffe, President of Defendant GPC, the management level is considered to begin at E7. One of the Named Plaintiffs who currently works for Defendants is in exempt grade 5; one is at exempt grade 2; the other is a non-exempt employee. Prior to her resignation, Plaintiff P. Harris was in grade E5 as a market research analyst.

Plaintiffs complain of the breadth of the salary ranges in the various job or salary grades. They state that it is possible for an employee to be in a higher grade than another, yet earn less money. Plaintiffs assert that this is a means of masking discrimination against African–Americans. It is correct that the salary ranges overlap.

While all of the Defendants use the same salary grade system, within different subsidiaries a particular job may "top out" at a different salary grade from another on account of the attributes of that position within that particular subsidiary. Also, not all positions exist within every subsidiary.

Defendants utilize common compensation and promotions policies promulgated and administered by Defendant SCS, as follows.

*JobNet Postings*

The majority of Defendants' vacancies for non-covered positions are filled by posting the position on Defendant TSC's computer intranet system known as "JobNet," which is accessible to virtually all employees. Required qualifications for the job and the job duties are stated in the posting. The applications are screened by managers and sometimes by Human Resources ("HR") personnel and an interview list is derived. Part of HR's job is to seek diversity in the list. SCS recommends that all candidates who receive an invitation to interview for a position be asked the same questions and provides "structured interview" guidelines which are tailored to the skills needed for the job under consideration. Specific questions are provided which should be asked of all interviewees. SCS recommends that a selection committee evaluate the candidates and determine by consensus which is best for the position. Scoring sheets are provided for the committee members' use. (Wolfe Aff., ¶¶ 5–30).

The Defendants have submitted numerous affidavits from their managers which state that they use selection committees. However, they are not required to do so. Even in cases where a selection committee is used, the manager is not required to accept the committee's recommendation.

*Leadership Development/Developmental Moves*

Defendant companies utilize leadership development programs which are designed to

---

7. Dr. Joan G. Haworth is a labor economist and econometrician retained by Defendants to conduct economic and statistical analyses of Defendants' employment policies as well as Plaintiffs' claims of discrimination.

8. The record variously refers to these grades as salary grades, pay grades or job grades. The terms mean the same thing.

identify employees who have demonstrated leadership potential and to provide them with opportunities to obtain experience in other areas. (Harber Aff., ¶ 45).[9] They also maintain a professional mentoring program and a professional development program. All of these programs are partly intended to increase diversity at the management level.

Defendants seek to identify talent and sometimes make promotions or transfers as a "developmental opportunity." These developmental opportunities are not posted on Defendants' JobNet system. Plaintiffs complain that "developmental moves" tend to be offered to Caucasians in preference to blacks.

### Performance Evaluations

SCS recommends that employees receive written evaluations, using a prepared form. A sample of the form is attached to Plaintiffs' Complaint as Exhibit D.

### Progressive Promotions

Advances within a "job family" for example, from engineer III to engineer II, are not posted as they do not reflect a job vacancy. Instead, an employee may receive a progressive promotion when she accomplishes certain pre-determined goals or milestones associated with a position, or has demonstrated satisfactory performance over a sustained period of time. (Conoly Aff., ¶ 13).[10] Plaintiffs assert that progressive promotions are discriminatorily denied to African–Americans because their performance and achievements are not fairly evaluated.

### Job Re-evaluations

Managers have the discretion to re-evaluate jobs within their departments if they determine that the actual skills required are above or below those anticipated by the job criteria.

9. Kathy Harber is the leadership development consultant at Defendant SCS.

10. Warren Conoly is the general manager of distribution services for Defendant GPC.

11. James Eavenson is the Manager of Fleet Operations for Defendant GPC. W.R. Hinson is the assistant comptroller for Defendant GPC.

### Job Rotation

There are occasions when two employees rotate jobs on a temporary basis so that each employee can learn new skills and gain a broader range of experiences. (Eavenson Aff., ¶ 10; Hinson Aff., ¶ 20).[11] Plaintiffs contend that African–Americans do not receive the same opportunities as whites for job rotation.

### Merit Increases and Incentive Bonuses

Senior management within each organization provides guidelines to managers concerning merit increases. Managers and supervisors within individual departments have discretion to determine how to allocate individual merit increases.

Most non-covered employees at Defendants GPC, SCS, and SCES are also eligible for lump sum incentive bonuses under a performance pay plan ("PPP").[12] Some managers allocate the same percentage to all employees regardless of performance while others allocate varying percentages in accordance with the achievement of individual or team goals. (Harvey Aff., ¶ 19).

Plaintiffs complain that in practice managers discriminate against African–Americans in giving merit increases and incentive bonuses.

### Affirmative Action/EEO

The Defendants have affirmative action plans, a Diversity Advisory Team, yearly goals for increasing diversity (the 2000 goal was to increase representation of women and minorities at Exempt Job grade 7), and other stated means of seeking diversity in the workforce including external recruitment. *See* Womack Aff., Plaintiffs' Exhibit 27. Plaintiffs assert that these procedures are ineffective.

12. Covered employees at GPC and employees working under a commission sales plan or an alternative compensation plan are not eligible for a PPP bonus. (Wilkinson Aff., ¶ 11).

*Vacancies under the CBA*

All transfers and promotions among covered positions are governed by the terms of the CBA. (Eavenson Aff., ¶ 12). Managers have little discretion in the method or criteria used to fill these jobs. (Lightfoot Aff., ¶¶ 7–8). Instead, managers identify their needs and call the Labor Relations Department at which point the jobs are posted and filled with the most senior bidder. (Hartz Aff., ¶ 11).[13] The CBA provides that certain "lead" jobs will be awarded based on seniority, competency being equal. GPC does use written tests in gauging competency for this purpose. The CBA does not appear to cover the position of foreman. *See* Lightfoot Aff., Exhibit C.

## III. THE NAMED PLAINTIFFS

Plaintiff Cornelius Cooper, one of seven Named Plaintiffs, is an African–American male employed by GPC as a lineman in Atlanta, Georgia. After high school graduation in 1970 Cooper worked in the concrete finishing business with his father. (Cooper Depo., p. 13). He has been employed by GPC since 1973 when he began working as a helper. Since that time, Cooper has worked as a winch truck operator, apprentice lineman, lineman, and lead lineman, all within the Customer Operations Division in or near metro Atlanta. (Cooper Depo., pp. 18–37, 47–50). He joined Local No. 84 of the International Brotherhood of Electrical Workers. The terms and conditions for all of these positions are covered by GPC's CBA.

Cooper has never taken the first line supervisor test, which has been identified by the Plaintiffs as a test which unfairly blocks African–Americans in covered positions from advancing to foreman. He has not applied for a foreman position since 1989 or 1990, as there have been no foreman positions open in his part of GPC since then. Cooper Depo., p. 299. He has never applied for a crew leader position. *Id.* at 299.

Plaintiff Cooper alleges that he applied but was not selected for a non-covered (i.e., non-union) position as trainer within the two year period[14] before this suit was filed. (Complaint, ¶ 78). One of the positions was awarded to Charlie Johnson, an African–American. (Cooper Depo., p. 266). Several positions as trainer were open at that time. Cooper did not file a charge with the Equal Employment Opportunity Commission ("EEOC"). (Cooper Depo., p. 213).

Plaintiff Cooper also states that he previously had applied for numerous other non-covered postings. He was interviewed but not selected. *Id.* at 294. Cooper was unable to identify any instances of alleged harassment or any racially offensive comments, documents, objects, or other items within the two years preceding the filing of this suit. (Cooper Depo., pp. 213–220).[15]

Plaintiff Michael Edwards is an African–American male who has been employed as a lineman by Defendant GPC in Atlanta, Georgia. Following high school graduation in 1978, he enlisted in the United States Marine Corps. *Id.* at 10. During his tenure in the Marines, Edwards became certified as an aircraft mechanic.

Edwards was hired by GPC in 1987. He has held various positions including utilityman and helper positions at Plant Vogle near Augusta, Georgia, an unassigned apprentice lineman position in Augusta and Hinesville, Georgia, and a lineman position (Customer Operations) in Tucker, Georgia. (Complaint, ¶ 86). Each of these positions is covered by the CBA. He has had several extended absences as well as light duty assignments as a result of various injuries and medical conditions. (Edwards Depo., pp. 16–18). Plaintiff Edwards states that he left work due to injury on May 18, 1998 and returned on November 22, 1998. He then held a temporary position until that position was eliminated in April, 2000. *Id.* Edwards has been out

---

**13.** Todd Hartz is the general manager of transmission maintenance for Defendant GPC.

**14.** Two years is the period of limitation for a Section 1981 claim. *Hill v. Metropolitan Atlanta Rapid Transit Authority*, 841 F.2d 1533, 1546

(11th Cir.1988), modified on other grounds, 848 F.2d 1522 (11th Cir.1988).

**15.** In his deposition, Plaintiff Cooper described two racist comments which occurred more than two years prior to the filing of this lawsuit.

of work on disability leave since that time. *Id.* at 18.

Plaintiff Edwards generally asserts that he has been denied promotions on the basis of his race. He applied and was interviewed for a cable locator position in March, 2000 which would have involved a cut in pay from lineman's pay [16] but which would have accommodated his physical limitations. The cable locator position was awarded to a Caucasian applicant. (Edwards Depo., pp. 93–94; Complaint, ¶¶ 88–89).

Edwards filed a complaint with the EEOC in 1999 alleging violation of the Americans with Disabilities Act. This claim did not mention race discrimination. Edwards has not identified any instances of harassment within the two years preceding the lawsuit. He states he did see a toy skeleton hanging from a cork board in the men's locker room at one facility before that. *Id.* at pp. 127–29. At about the time this lawsuit was filed, he filed a charge of discrimination with the EEOC alleging individual and class-wide claims of race discrimination against Defendants and received a Notice of Right to Sue. (Complaint, ¶ 93).

Plaintiff Charcella Green is an African–American female who is currently employed by Defendant GPC as an education services coordinator in Atlanta, Georgia. Green graduated from high school in Atlanta, Georgia in 1967 (Green Depo., p. 60) and received a B.S. degree in human services administration from Mercer University in 1981. In 1983 she received a master's degree in social work from Clark Atlanta University. In 1999 she received a Ph.D. degree. *Id.* at 69.

Green began working for GPC in 1983 in a temporary internship position in External Affairs. Subsequently she held positions as associate public information representative, assistant to the director of corporate communications, education services coordinator, communications coordinator, and area development organizer advisor. These are exempt positions. Her current position is at salary grade 5. Plaintiff Green alleges that she was denied an educational services man-

ager position awarded to a Caucasian applicant on July 11, 1998.[17] (Complaint, ¶ 110). Green believes the current holder of this position is at salary grade 7. (Green depo., p. 206). Green alleges that she has been compensated less favorably than several similarly situated Caucasian co-workers, and that several Caucasians with less education and seniority have received job rotations or other developmental moves that she has not received. (Complaint, ¶¶ 113–16). Green has not identified any workplace comments or conduct which could be characterized as racially hostile. She did not file a complaint with the EEOC.

Plaintiff Patricia Harris ("P. Harris") is an African–American female and a former employee of both Defendant GPC and Defendant Southern Company Services ("SCS") where she worked as a marketing research analyst. Harris received an associate degree from Gordon College in 1981. In 1985, she received a biology degree from Georgia State University in Atlanta, Georgia. Subsequently, in 1997, she earned an MBA degree from Georgia State University. (Complaint, ¶ 154).

Plaintiff P. Harris began working for Defendant GPC as a secretary in 1990 in Marketing and Regulatory Affairs. After working for Defendant GPC for thirteen months, she was offered a permanent position and promoted to senior secretary by her supervisor, Buddy Cromer. (P. Harris Depo., p. 36). Subsequently, Harris advanced through several positions including research analyst and economic development analyst. These are exempt positions. (P. Harris Depo., pp. 34–39).

In 1997, P. Harris became an employee of SCS in a market research analyst position, an E5 grade position. (Complaint, ¶ 159). The Complaint states that "[a]lthough the salary range for an E5 employee in 1998 was $42,396 to $67,836, [P]laintiff P. Harris' salary was only approximately $45,000." (Complaint, ¶ 155). She generally alleges that she experienced racial discrimination in pro-

---

**16.** It is not clear that this position would have been a promotion.

**17.** This date is more than two years before the filing of the instant action.

motions, compensation and performance evaluations.

Plaintiff P. Harris applied for no promotions during the relevant two year period except for a liaison position which she could not identify. (P. Harris Depo., pp. 147, 259–60). She did not file a charge of discrimination with the EEOC. She could not identify any patently offensive racial comments, conduct, documents, objects, or events during the two year period preceding this lawsuit. *Id.* at 173–78. Plaintiff P. Harris voluntarily resigned in August, 1999. *Id.* at 16.[18]

Plaintiff Sarah Jean Harris ("S.J. Harris") is an African–American female who was employed by Defendant GPC from 1979 until mid–2000. Following graduation from high school in 1963, she took courses in shorthand, accounting, data processing and real estate law at Gwinnett Area Technical College and received certificates for completing numerous courses. She began working as a utility operator for Georgia Slack Company in approximately 1966. *Id.* In 1973, she began working as a secretary for Sears department store in Atlanta, Georgia. She also worked as a sales associate at Belk department store and as a bank teller at Gwinnett Federal Bank.

S.J. Harris began as a general "Clerk B" in a Region Operations facility in Lawrenceville, Georgia, moved to a secretary position in another facility as part of a reorganization in 1994, and became a region support representative in 1997. (S.J. Harris Depo., pp. 31–37, 62). These positions were not covered by the CBA and appear to be non-exempt positions.

S.J. Harris did not apply for any promotions during the relevant period. She could not identify any instances of a hostile environment during the relevant period. *Id.* at 157.

Plaintiff S.J. Harris received several poor evaluations and was placed in "positive discipline" in 1999. (S.J. Harris Depo., pp. 78–94, 101–02). Ultimately, she received higher levels of discipline, including probation. *Id.* at 106. Her employment was eventually terminated as a result of an incident during her probationary period. *Id.* at 158–60. Plaintiff S.J. Harris contends that her performance evaluations were tainted by intentional discrimination and that her termination was in retaliation for her participation in the instant litigation. *Id.* at 69–70. She filed a charge with the EEOC shortly after being terminated in the summer of 2000.

Plaintiff Irene McCullers is an African–American female hired by Defendant GPC as a file clerk in 1978. (McCullers Depo., p. 39). Before that she attended Blatton Business College, a two year business college in Atlanta, Georgia, and also worked in the claims department at Cotton States Insurance Company for approximately six years. *Id.* at 37.

In addition, McCullers has held at least ten other positions, in five separate job grades, including micrographics clerk, accounting clerk, accounting representative, document processing operator in finance at GPC, and processing operator I with the SCS Information Management Services Department. These are non-covered, non-exempt positions. She alleges she has experienced racial discrimination in promotions, compensation and performance evaluations. Specifically, Plaintiff McCullers alleges that she has received consistently low performance evaluations and that she has received lower annual increases than her Caucasian co-workers. *Id.* at 133–35. In her deposition, Plaintiff McCullers failed to identify any examples of a hostile work environment within the relevant two year period. *Id.* at 146–52. Although she has never applied for a posted position, she alleges that she has been denied a number of progressive promotions. (McCullers Depo., p. 55; Complaint ¶¶ 151–52). In her deposition, Plaintiff McCullers stated that she never heard any racial epithet by any co-worker, supervisor, or manager during her employ-

---

18. Plaintiff P. Harris submitted a resignation memo to her supervisors which stated, "[m]y experience at Southern has enriched me deeply ... I am grateful for the positive experiences and relationships developed over the years at Southern." In another memo, written to her co-workers, Plaintiff P. Harris stated, "I look back and I am in awe of how God has placed the most wonderful people in front of me and placed them within one company—the Southern Company. I am definitely 'the better for it' for having experienced the Southern style."

ment. *Id.* at 63. McCullers did not file an EEO charge.

Plaintiff Carolyn Wilson is an African–American female employed by Defendant Southern Company Energy Solutions ("SCES") as a Project Analyst III in Forest Park, Georgia. Wilson attended college at Mercer University in Atlanta, Georgia. (Wilson Depo., p. 35) and also studied electronics as a Lance Corporal in the United States Marine Corps. *Id.* at 37.

Plaintiff Wilson initially worked for Defendant GPC in Customer Service beginning in 1985. (Wilson Depo., p. 11). She received several promotions before she applied for and received a project analyst position at SCES in 1997. She also applied and interviewed for a customer service representative position in 1998 and, after receiving an offer, declined it. *Id.* at 160–61. Wilson's current position, project analyst III, is an exempt position at salary grade 2. Wilson generally alleges that she has experienced racial discrimination in promotions, compensation and performance evaluations. She also claims that she was promised a $10,000 raise, but that she received only half of that amount. (Complaint, ¶¶ 132, 137). Also, she alleges that she was denied training opportunities by another African–American employee in Human Resources, and that she has not received performance evaluations. (*Id.* at ¶ 141; Wilson Depo., pp. 38–41). Plaintiff Wilson has not identified any patently offensive racial comments, conduct, documents, objects, or events in the workplace during the two-year period. (Wilson Depo., pp. 88–97).[19] Wilson filed a charge with the EEOC at the approximate time this lawsuit was filed. The EEO complaint stated that she had been subjected to discrimination, but was unspecific as to the event or events comprising the discrimination.

Summarizing, the seven named Plaintiffs include three persons who no longer work[20] for any Defendant. Of the remaining four who are currently employed, one is a lead lineman whose rate of compensation is covered by a collective bargaining agreement. Two hold non-management, exempt positions in Atlanta, Georgia. One holds a non-exempt position. One of these four Plaintiffs (Plaintiff Wilson) filed a complaint with the EEOC complaining of disparate compensation and only Plaintiffs Cooper and Wilson were denied a competitive promotion within the two year period immediately preceding the filing of this suit.

## IV. STANDING

Before a district court may undertake analysis of whether the requirements of Rule 23 of the Federal Rules of Civil Procedure are met so as to permit certification of this case as a class action, the court must first "determine that at least one named class representative has Article III standing to raise each class subclaim." *Prado–Steiman v. Bush,* 221 F.3d 1266, 1279 (11th Cir.2000). "Only after the court determines the issues for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others." *Prado–Steiman,* 221 F.3d at 1280 (citing *Griffin v. Dugger,* 823 F.2d 1476, 1482 (11th Cir.1987)). "A named plaintiff in a class action who cannot establish the requisite case or controversy between himself and the defendants simply cannot seek relief for anyone—not for himself, and not for any other member of the class." *Griffin,* 823 F.2d at 1483. "Under elementary principles of standing, a plaintiff must allege and show that he personally suffered injury." *Id.* at 1482. Each claim asserted by a named plaintiff "must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." *Prado–Steiman,* 221 F.3d at 1280 (citing *Griffin,* 823 F.2d at 1483).

After thoroughly examining the record,[21] the court has made the following determina-

---

**19.** Plaintiff Wilson did state that on one occasion a co-worker asked her "what's wrong with black women?". (Wilson Depo., p. 90).

**20.** The Court includes in this group Plaintiff Edwards, whose position was eliminated in April 2000 and who has been on disability leave since then.

**21.** The court rejects the notion that Plaintiffs were not required to file an EEOC Charge within 180 days of any discriminatory incident. To the

tions regarding Named Plaintiffs' standing to assert various claims:

Cornelius Cooper has standing, under § 1981 only, to assert a discrimination in promotion claim based upon his denial of promotion to a trainer position on August 26, 1998.

Michael Edwards has standing, under both Title VII and § 1981, to assert a discrimination in promotion claim based upon the denial of a cable locator position in April 2000.

Sarah Jean Harris has standing to assert discrimination in evaluation and compensation claims under Title VII and § 1981.

Carolyn Wilson has standing to assert a discrimination in compensation claim under Title VII and § 1981 and has standing to assert a discrimination in promotions claim under § 1981 only.

Charcella Green has standing to assert a discrimination in compensation claim under § 1981. She would have standing as a class member to assert a Title VII claim based on the EEO charges filed by Carolyn Wilson if this case were certified as a class action.

Irene McCullers has standing to assert a discrimination in compensation claim under § 1981 and has standing to assert a discrimination in progressive promotions claim under § 1981 based on Defendants' failure to promote her to Processing Operator Senior. She would also have standing to assert these claims under Title VII cased on Carolyn Wilson's EEO charge if this case were certified as a class action.

Patricia Harris has standing to assert discrimination in compensation and promotion claims under § 1981 only.

The Named Plaintiffs have no standing to assert other claims.

## V. ALLEGATIONS OF CLASS WIDE DISCRIMINATION AS SET FORTH IN THE COMPLAINT

Section V of the Complaint sets out Plaintiffs' allegations of class-wide discrimination. Plaintiffs urge that there is a class wide

extent that Plaintiffs rely on undated activity, the court has not considered this in the issue of

"continuing pattern and practice of racial discrimination"; that they and the class have been subjected to discriminatory treatment; and that "the Defendants' policies and practices have had an ongoing disparate impact." (Complaint, ¶¶ 31, 32). The Complaint, Section V, sets out as the ways in which Defendants discriminated against African–Americans the following:

d. Failing to promote African–Americans to the same level or at the same rates as similarly-situated Caucasians;

e. Maintaining written and unwritten policies and practices regarding job opportunities, including the use of a highly subjective job posting and interview process, that significantly hamper the ability of African–Americans to advance and obtain open positions;

f. Creating and maintaining a "glass ceiling" that virtually excludes African–American employees from obtaining senior-level positions;

g. Paying non-covered African–American employees less than Caucasian employees who perform the same or similar work;

h. Maintaining written and unwritten policies and practices for determining compensation that result in non-covered African–Americans receiving lower compensation than their Caucasian counterparts;

i. Maintaining written and unwritten policies and practices for performing evaluations of employees that provide managers with significant discretion and allow them to place inappropriate weight on subjective criteria, resulting in biased and inconsistent performance evaluations;

j. Failing to provide African–Americans equal terms and conditions of employment, including subjecting African–American employees to a racially hostile environment;

standing.

k. Failing to properly monitor and oversee employment, personnel and human resources practices and failing to provide adequate training and oversight of supervisors to ensure that Company policies are applied consistently and in a nondiscriminatory manner.

## VI. EVIDENCE RELIED UPON BY PLAINTIFFS TO OBTAIN CLASS CERTIFICATION

Plaintiffs base their motion for class certification on a number of evidentiary sources: selected deposition excerpts, affidavits, a large number of documents (mostly documents generated by Defendants), the expert report of an economist, Dr. Janice Madden, analyzing promotions and salary data, and the expert report of Dr. Kevin Murphy, a psychologist.[22]

Overall, Plaintiffs' evidence breaks down into a number of substantive categories: statistical evidence and expert testimony regarding discrimination in promotions and compensation, "hostile environment" evidence concerning racial jokes and nooses found at GPC's facilities, evidence of individual African–American employees' experiences with efforts to obtain promotions and increased compensation and their belief that they have been discriminated against; evidence that Defendants' promotions and compensation policies include aspects of subjectivity or discretion which can mask discrimination; and evidence that past racial inequities known to Defendants' management have not been corrected. Each will be discussed and evaluated in turn, beginning on page ——, *infra*.

## VII. LEGAL STANDARDS

Plaintiffs seek to have the class certified under Rule 23 of the Federal Rules of Civil Procedure, which provides in relevant part:

(a) **Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) **Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\* \* \* \* \* \*

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

■ The burden of establishing the specific prerequisites to a Rule 23 action falls on those seeking certification. *Hudson v. Delta*

---

22. Defendants have submitted a large number of affidavits mostly describing the companies' policies and procedures regarding promotions and compensation as well as the efforts which have been made to improve diversity. Defendants have also tendered an expert report of an economist, Dr. Joan G. Haworth, which evaluates Dr. Madden's expert report and offers additional statistical analyses which support Defendants' position that they do not discriminate. Defendants also offer the report of Ronald R. Sims, Ph.D., a professor of organizational behavior and human resources, which criticizes and responds on a point-by-point basis to the opinions expressed by Plaintiffs' expert witness Dr. Murphy.

*Air Lines, Inc.,* 90 F.3d 451, 456 (11th Cir. 1996); *Gilchrist v. Bolger,* 733 F.2d 1551, 1556 (11th Cir.1984). The Court must be satisfied, after a "rigorous analysis," that the requirements of Rule 23(a) have been fulfilled. *Coon v. Georgia Pacific Corp.,* 829 F.2d 1563, 1566 (11th Cir.1987).

## 1. Rule 23(a)

### A. *Numerosity*

■ The SHIPS database information produced by Defendant TSC establishes that the proposed class encompasses over 2400 people, a number well in excess of the number needed to satisfy the numerosity requirement. *See Cox v. American Cast Iron Pipe Company,* 784 F.2d 1546, 1553 (11th Cir. 1986) ("more than forty" adequate to satisfy numerosity requirement). Defendants do not contest this.

### B. *Commonality and Typicality under Rule 23(a)(2–3)*

Plaintiffs contend that there are questions of law and fact common to the class and that the claims of the Plaintiffs are typical of the class members so as to warrant designating them as representatives of all of Defendants' African–American employees from July 1998 to the present, and in the future as well.

Defendants emphasize that "[t]he countless individualized inquiries necessary to adjudicate the purported class-wide claims overwhelm any cohesiveness and render collective treatment completely inappropriate." (Defendants' Brief, p. 31).

The commonality requirement does not require that all questions of fact and law raised in the action be common. However, "[t]he claims actually litigated in the suit must simply be those fairly represented by the named plaintiffs." *Cox, supra,* 784 F.2d at 1557. An analysis of typicality is similar to commonality, but there is a stronger focus on the representative named plaintiffs. *See Prado–Steiman ex rel. Prado v. Bush,* 221 F.3d 1266, 1279 (11th Cir.2000) ("commonality refers to the group characteristics of the class as a whole and typicality refers to the individual characteristics of the named plaintiff in relation to the class").

There is an interrelationship between the Rule 23 requirements of commonality, typicality, and adequacy of representation:

> The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.

*General Telephone Company of the Southwest v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)

Thus, sections 23(a)(2) and (a)(3) are calculated to ensure that regardless of whether the class representatives and all class members win and the opposing party loses, or alternatively if the class representatives and class members lose and the opposing party wins, all who are affected on both sides will have had a fair opportunity to have their claims or defenses heard and determined on the merits.

While it is relatively simple to evaluate the merits of a dispute involving one plaintiff and one defendant, fairness to both sides in a class action is a far greater challenge and places considerable responsibility on the Court. If a class representative with a weak case loses and individual class members with strong cases are bound by the negative outcome, an injustice will have occurred. Similarly, if a winning class representative's claim and the class member claims are dissimilar, it may be unjust for the opposing party (usually the Defendant) to be responsible for the claims of class members. The Court's responsibility is to make sure that the common bond between the class representatives' claims and those of the class is strong enough so that it is fair for the fortunes of the class members to rise or fall with the

fortunes of the class representatives. That is the very purpose of Rule 23(a).

Plaintiffs argue that common factual and legal issues exist which would be significantly dispositive of the issue of liability as to all class members. They argue that their evidence is strong enough to establish a presumption or pattern and practice of discrimination common to all class members as well as themselves. Plaintiffs specifically argue that the evidence of Defendants' promotion and compensation practices (*e.g.*, use of subjective criteria for promotions, non-posting of some job openings) coupled with the expert testimony of Dr. Madden and that of Dr. Murphy proves that Defendants' personnel and compensation practices as a whole have adversely impacted all African–Americans in the class. They also argue that when the statistical evidence is coupled with evidence of numerous acts and statements of racial hostility within the Defendant companies, plus evidence that many African–American employees have not received deserved promotions, a "pattern and practice" of racial discrimination is revealed which is common to all Named Plaintiffs and class members.

Defendants argue that the statistical, anecdotal and other evidence is insufficient in quantity and quality to raise a presumption of discrimination or to show a pattern and practice of discrimination common to all class members. Defendants argue that the statistical proof is seriously flawed in numerous respects.

Plaintiffs seek to proceed under two different substantive theories recognized by the law in discrimination cases: disparate treatment and disparate impact. A plaintiff generally establishes disparate treatment by showing that the employer intentionally treated him less favorably than similarly-situated white employees because of his race. *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). A three part inquiry established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), requires the plaintiff to prove his qualification for a denied promotion which went to a nonmember of a protected class; the defendant employer must state a nondiscriminatory reason why the plaintiff was not chosen. Plaintiff must then establish that the Defendant's stated reason is a pretext for discrimination. Obviously, this is a fact-intensive process which focuses on the facts surrounding a particular plaintiff's claims. To obtain certification of a class in so-called disparate treatment cases, the plaintiffs must show not merely that they individually were subjected to discriminatory ("disparate") treatment; they must show that "racial discrimination was the [company's] standard operating procedure—the regular rather than the unusual practice." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). This type of case is called a "pattern and practice" case. Plaintiffs contend that their statistical and other evidence meets this standard.

Under the so-called disparate impact theory, Plaintiffs must show that a facially neutral requirement or policy of Defendant's disproportionately and adversely affects members of a protected group. Where this showing is made, the employer then has the burden of demonstrating the necessity for and job-relatedness of the criterion in question. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). A classic disparate impact case would be presented, for example, where an employer has minimum height and weight requirements which disproportionately exclude women. *See Dothard v. Rawlinson*, 433 U.S. 321, 331–34, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (disparate impact found for height and weight requirements for prison guards). Again, Plaintiffs contend the statistical evidence shows that African–American employees have been disproportionately disadvantaged by the collective whole of Defendants' personnel policies.

### 1. *Typicality*

■ The Court will first address the issue of typicality. Plaintiffs have made little effort to show what facts prove this requirement. While the complaint does detail the profiles of each of the Named Plaintiffs, Plaintiffs have not attempted to relate the profiles to those of the class or different

segments of the class. Rather, Plaintiffs emphasize the fact that all claims share common legal theories and that a "pattern and practice" of discrimination affects all class members.

The Court is unconvinced that Plaintiffs Edwards, S.J. Harris and P. Harris have claims typical of those of the class. Edwards' claims uniquely involve the factual issues surrounding his disability; P. Harris voluntarily resigned and has asserted no timely promotions claims of substance[23] and S.J. Harris was involuntarily terminated at approximately the time this litigation began for an alleged incident which occurred when she was already on disciplinary probation. While each of these Plaintiffs may ultimately have one or more meritorious claims, their claims involve idiosyncratic features, raising questions concerning their ability to represent absent class members. Plaintiffs have the burden of showing typicality, and have failed to make an adequate showing as to these Plaintiffs.

With respect to Named Plaintiffs Cooper, Green, McCullers and Wilson, the Court is unconvinced that they have claims typical of the class as a whole. No factual showing has ben made in this regard.

Turning to the question whether individual Named Plaintiffs may have claims typical of some subgroup, Plaintiff Cooper's position (lineman) is covered by the CBA, a characteristic shared by a large number of potential class members. Plaintiffs' complaint specifically states that only 5 of 150 foremen (3.3%) at GPC are African–American, even though large numbers of African–Americans such as Cooper hold lineman jobs, the "feeder pool" for this position. Plaintiffs' theory appears to be that GPC is using a written test, the first line supervisor test, to improperly hold African–Americans back from foreman. Plaintiffs seem to assert that seniority, not the ability to pass the test, should govern these promotions or alternatively that the test is not valid. However, Cooper has never taken the first line supervisor test, and has not applied for a foreman position in recent

years. Cooper's claim, as expressed in the Complaint, is that he was wrongfully denied a trainer position at GPC's Klondike Training Center. This is a non-bargaining unit position for which there were competitive interviews. The Court finds that Cooper's claim for discriminatory denial of promotion from a position covered by the CBA to an exempt position is typical of those of other covered employees who seek similar promotions. However, Cooper's claim is not typical of those covered employees who seek the positions of crew leader or foreman.

Based on the information provided, the Court is not convinced that Plaintiffs Green and Wilson, who are exempt non-management employees, have claims typical of those absent class members who aspire to Defendants' top management as described in paragraphs 34, 35, 36 and 38 of Plaintiffs' Complaint. Wilson's position (Exempt level 2) is not close to management ranks. While Plaintiff Green did apply for a position at level 7, Defendants' management levels go from 7 to 15. Also, Green did not apply for a competitive promotion within the two year period of limitations for § 1981 claims. Green has standing to assert a compensation claim under Title VII and § 1981, but no standing to assert a promotion claim. Thus, none of the Named Plaintiffs have promotions or compensation claims which are typical of those of management level employees at Exempt Levels 7–15.

The Court finds that Plaintiff Wilson has promotions and compensation claims typical of those of exempt non-management employees. Also, Plaintiff McCullers has compensation and progressive promotions claims typical of those of non-exempt, non-covered employees. Plaintiff Green has compensation claims typical of those of exempt non-management employees.

### 2. *Commonality*

■ With respect to commonality, again it seems to the Court that it is impossible to conclude that the employment experiences of

---

**23.** Harris claimed to have applied for some type of liaison position in April 1999, but could not   identify the position.

the Named Plaintiffs or the specific ways in which they claim to have experienced discrimination may be fairly compared with the history or individual experiences of absent class members or that the claims of class members share discrete common features such that rulings could be fashioned to fairly adjudicate these claims as a group. It is obvious that the Defendant companies collectively have a large number of employees, with many different job classifications, different locations, different supervisors, differing modes and levels of compensation, and many skill levels. It is unlikely that proof of a particular Named Plaintiff's claim would shed light on the merits of an absent class member's claim.

Thus, it appears that whatever commonality may exist could only be a function of the alleged pattern and practice of discrimination or disparate impact of unjustified policies which affect the members of the class. Plaintiffs contend that the pattern and practice is shown by the statistical evidence, the alleged atmosphere of racial hostility as shown by the evidence about the nooses, racial jokes, slurs and epithets and the affidavits of 111 potential class members who have related their own experiences. Plaintiffs assert that the conclusions of Dr. Madden prove that Defendants' collective policies have adversely impacted African–American employees of Defendants as to promotions and compensation. Therefore, it is important to focus on the relative strength and quality of that evidence to determine if it is strong enough to provide the element of commonality needed for class certification. The Court will first describe and evaluate the reports of Plaintiffs' experts.

### a. *Murphy Report*

Dr. Murphy summarizes his general conclusions drawn from his examination of Plaintiffs' affidavit and deposition testimony as well as other data concerning Defendants which was provided to him by Plaintiffs.

The report concludes that Defendants have adopted "[p]olicies aimed at preventing or minimizing the likelihood of discrimination," but that managers and supervisors have "[d]iscretion to ignore these policies and use criteria that are not job related." (Murphy Report, p. 2). The report also makes general conclusions such as "there is little indication that [managers or supervisors] have the information, training, support or oversight that would allow and require them to make employment decisions on the basis of criteria that is job related." *Id.* at 8. This conclusion was based on the fact that Dr. Murphy was unable to find among the documents which he reviewed an "indication of any mandatory program to train managers or even to assist them in making decisions about job-posting, hiring, promotion, and compensation in a way that will be job-related and that will avoid discrimination against black employees." *Id.* Essentially, Dr. Murphy's report is a summary of Plaintiffs' evidence which is used in support of their motion for class certification, together with his own opinion of what impact these Defendant policies, or lack of policies, might have had on African–Americans. As such, it has no usefulness as an expert report.[24]

### b. *Madden Report*

Dr. Janice Madden obtained raw data concerning each of Defendants' employees from Defendants' SHIPS system, a computerized personnel database used by all of the Defendants. After organizing and evaluating the data provided, Dr. Madden reached conclusions which Plaintiffs argue support their claim that Defendants' collective decision-making processes which determine promotions and compensation have disproportionately and adversely affected African–American employees. Defendants on the other hand claim that Madden's analyses and computations are invalid or of limited value for a variety of reasons.

---

24. For the same reason, Dr. Sims' rejoinder to Dr. Murphy's report is of little assistance in determining the facts or in determining whether Defendants support a pattern and practice of discrimination or have invalid policies which have a disparate impact on African–American employees. Also, neither Dr. Murphy nor Dr. Sims is an expert on Defendants' businesses. They both make wide-ranging assertions and conclusions based entirely on a set of documents provided for their review. Both point out what "could happen" under Defendants' policies.

Madden's written reports dated March 27 and June 12, 2001, entitled "Evaluating Whether Employment Practices at Southern Company Are Racially Neutral" (hereinafter "report") have been reviewed by the Court. The report concludes that African–American employees within the Defendant companies received 14.3% fewer promotions than would be indicated by their numerical representation in the workforce from December 31, 1996 through December 11, 1999. It also concludes that for the years 1995–1999 combined the correlation between race (African–American) and odds of promotion, controlling for the factors of salary grade, subsidiary, tenure with Defendants, time since completing schooling, level of education and initial job function [25] is a correlation of minus .3836 with a Z value of 6.87.[26]

Using the same control factors, Madden determined that the estimated percentage differences in compensation between all white and black employees (excepting union employees) were as follows in each of the indicated years:

| | |
|---|---|
| 1995 | 3.28% |
| 1996 | 2.83% |
| 1997 | 2.95% |
| 1998 | 2.76% |
| 1999 | 2.11% |

The percentages were found highly unlikely to be the function of chance.[27]

In analyzing promotions, Madden first constructed "pools" [28] of employees for the purpose of determining whether African–Americans in each pool received a proportionate share of promotions based on the ratio of African–American employees to total employees in that particular pool.

The report states that 288 employee "pools" were constructed. Within each of the Defendant companies (not including Southern which has no employees) she constructed pools or lists of employees within each salary grade [29] for each calendar year from 1996 through 1999. She used year-end data in each calendar year. By comparing the identity of the employees in the pools from year to year, she was able to identify those employees who had received promotions during the past calendar year. In Madden's study the term "promotion" meant (1) receiving an increase in salary grade, (2) moving from a non-exempt to an exempt position, or (3) moving out of a union job into a nonunion job with a higher annual rate of pay. She was able to identify the promoted and the non-promoted employees by race. In this manner, she determined the percentage of promotions which had gone to African–American employees in individual pools in each year.

Madden then determined the numerical extent to which promotions of African–American employees either exceeded or fell below that projected by their proportionate representation within each pool for each year. She then added the positive and negative numbers yielded by the foregoing analysis of all of the individual pools, and determined that while African–American employees received a total of 531 promotions in 1996–1999, their numerical presence within the total employee population yielded an expected number of 607 promotions. Thus, Madden determined that promotions for African–American employees fell short by 76 during 1996–1999, a percentage shortfall of 14.3%. A further

25. Initial job function is defined as job function as of 1995, if hired before then, and at time of hiring if hired after 1995. Job function does not mean job title. Defendants' SHIPS database contains codes for twenty-two "job functions" such as Administration, Operation, Generation, Marketing, and Customer Services. Neither does job function refer to a particular department.

26. A Z value of 6.87 means it is very unlikely that the correlation occurred by chance. The higher the Z value, the greater the unlikelihood.

27. The relevant Z values ranged from 7.75 (1995) to 3.83 (1999).

28. The report states this is a "multiple pools test."

29. The salary grade system at all of the Defendant companies is the same although different jobs carry different ranges of salary grade. For example, a particular job opening might announce that the position is in Grades 3–5. The successful applicant could be offered compensation within Grades 3, 4 or 5. Plaintiffs believe this is one of the mechanisms used to discriminate against African–Americans.

calculation determined a probability of less than 3 in 100,000 that this result is due to chance.[30]

As a second step in analyzing promotions, Dr. Madden performed another statistical analysis [31] to determine the degree of correlation between race and odds of promotion. To do this she analyzed the promotions given to African–Americans and Caucasians in Defendants' workforce combined, using the following controls: (1) the salary grade of each employee, (2) the employer (GPC, SCS or SCES), (3) the employee's experience and (4) the employee's education. "Experience" for this purpose was defined as the amount of time a particular employee had spent in the work force after finishing formal education, as well as the amount of time an employee had worked for one or more of the Defendant companies.[32]

As to education, Madden classified employees according to 13 educational levels: unknown, less than high school, GED, high school diploma, training certificate, more than high school, little college, associate degree, some college, bachelors degree, some graduate school, masters degree, and professional degree.

As previously stated, Madden found some negative correlation (minus .38) between race (African–American) and odds of promotion.

In order to measure the relationship between race and salary at the Defendant companies for each of the years 1995–1999, Madden did the following: She first determined that in each of these years African–American employees within each salary grade at each subsidiary company made less than other employees. Union employees were omitted from these calculations.[33] She also performed calculations utilizing additional variables (subsidiary interactions,[34] salary grade, job function, experience, and education) in different combinations.[35] As previously stated, this calculation showed that the wage gap between white and black employees was between 3.28% and 2.11% depending on the year.

After reviewing Madden's report, Haworth's report which criticizes Madden's report, and the arguments of the parties, the Court concludes that while Madden's methodologies may be valid, the analysis has some limitations which undermine its usefulness in measuring whether Defendants' employment practices are racially neutral. Primarily, this is caused by the failure to adequately measure the promotion and compensation experiences of similarly situated employees. Most importantly, Madden identified "experience" as one factor which has a bearing on promotions and compensation level, obviously a critical variable. However, under Madden's definition "experience" meant only (1) the amount of time which had elapsed since the individual's finishing formal education and (2) the amount of time the individual had been on Defendants' payroll. There was no consideration of such factors as type or level of acquired skills, both of which are highly related to promotions and level of compensation. Nei-

**30.** Madden used the "multiple pools exact test", a generalization of Fisher's Exact Test, to make this determination. *See* March 27 Madden report, p. 5.

**31.** A logistic regression test.

**32.** Apparently these two components of "experience" were treated as two separate variables.

**33.** It appears that Plaintiffs are not asserting discriminatory compensation within the covered, or union, workforce.

**34.** It is unclear what is meant by "subsidiary interactions".

**35.** This calculation is a multiple regression analysis. Multiple regression analysis is a quantitative method of estimating the effects of different variables on some variable of interest. In multiple regression, one first specifies the major variables that are believed to influence the dependent variable. There inevitably remain minor influences, each one perhaps very small, but creating in combination a non-negligible effect. These minor influences are treated by placing them in what is called a random disturbance term and assuming that their joint effect is not systematically related to the effects of the major variables being investigated—in other words by treating their effects as due to chance. The relationship between the dependent variable and the independent variable of interest is then estimated by extracting the effects of the other major variables. Fisher, *Multiple Regression in Legal Proceedings*, 80 Colum.L.Rev. 702, 705–06 (1980) (footnotes omitted).

ther was there any effort to compare employees with equivalent work experience in specific job categories or job progressions. Admittedly, it would be very difficult to factor those considerations into a statistical analysis such as the one Madden performed; however, their omission is relevant in determining how much confidence to place in her conclusions.

Also, Madden did not compare outcomes for those employees, both black and white, who had actually applied for posted positions. Because Defendants maintain an automated application process for all competitive promotions for nonexempt and exempt positions, this comparison is not difficult.

In determining whether or not a given employee had had a promotion, Madden did not distinguish between so-called progressive promotions (which do not involve a job vacancy but rather moving the employee to a higher salary and title within a job family) and competitive promotions. Some progressive promotions occur within a given salary grade; these in-grade progressive promotions apparently were omitted entirely from Madden's study. This appears to be a flaw. Defendants also argue that it is improper to lump progressive promotions and competitive promotions together; however, this argument is rejected because both types of promotions involve evaluative choices by management.

Defendants object to Madden's definition of "education" because it fails to take into account field of study. Defendants point out that at their higher salary grade levels, large percentages of managers possess engineering degrees, whereas within the African–American population at large as well as within the Defendant companies, African–Americans do not tend to hold engineering degrees as compared with degrees in other fields of study. The Court believes that the Defendants have a valid point, insofar as Madden's conclusions are directed toward the higher levels of management; however, as to employees at level 6 and below, Madden's definition of education is fully adequate for the purpose chosen.

Dr. Haworth's report is particularly critical of Dr. Madden's analysis of promotions for failing to model the analysis to the decision-making process actually used by Defendants. Haworth points out that there are typical lines of promotion within departments and job families which were not considered by Madden. Haworth's point has merit;[36] Madden did not compare similarly situated individuals.

In seeking to show that Defendants' promotions and compensation policies are racially neutral, Defendants rely on Dr. Haworth's report which concludes there is no reliable evidence that there is any difference in treatment as between whites and blacks. Haworth analyzed the issue of effect of race on salary and promotion by using more variables and by comparing the experiences of more similarly situated individuals. Haworth's analysis revealed that there were small gaps between the promotions rate for African–Americans versus Caucasians, as well as small salary gaps; however, she determined that these gaps were not statistically meaningful. Madden in turn replied, in her June 12 report, that the lack of statistical significance was due to the fact that Haworth had "carved up" the employees into pools[37] so small that it would be unlikely that the results would be statistically significant. The Court believes there is some truth in this. The Court also notes that Haworth's analysis did not include the so-called "developmental moves" in her analysis of promotions. Neither has either side offered evidence concerning what percentages of promotions occur through developmental moves. This is a factor limiting the usefulness of Haworth's report to the extent it is intended to prove that Defendants' treatment of African–Americans is the same. After reviewing both reports, as well as other information in the record, the Court is left with the impression

---

**36.** In Madden's June 12 report she added job function as a control; however, she used only 22 job functions for all employees. She did not consider normal lines of progression; apparently, Madden did not have data needed for this purpose.

**37.** Dr. Haworth also used the multiple pools analysis.

that there could be some salary gap and promotions gap between African–American and white employees working for the Defendants, although it is impossible to determine what the gaps are, whether they are statistically significant, or whether factors other than race are involved.

Defendants have pointed out that of the 148 "pools" of employees identified by Madden for the years 1998–1999, only three pools showed a representational deficiency of African–American promotions: two union salary grade pools and one pool for non-exempt salary grade 5 employees. While this may not undercut the validity of the method Dr. Madden used, it may be evidence that promotional inequity affecting African–American employees (defining inequity as lack of at least proportionate representation in the promoted pool) exists only in segments of the workforce.

Based on the foregoing analysis of the expert testimony offered by the parties, the court concludes there has been an inadequate showing by Plaintiffs to raise a presumption of discrimination arising from application of the collective whole of Defendants' compensation and promotion policies. Thus, disparate impact analysis produces no evidence common to the claims of all class members. Also, the expert testimony fails to establish evidence of a pattern and practice of discrimination.

### c. *Noose Evidence*

In further support of their argument on the issue of commonality, Plaintiffs cite the existence of various nooses at various GPC locations which establish the existence of an atmosphere of hostility common to the class as a whole. The evidence on this point is as follows.

This case was filed on July 27, 2000. The original complaint contained the following allegation:

> from 1997 through 1999 Defendants permitted a hangman's noose to be hung in a heavily traveled area of Georgia Power's operating headquarters at Cornelia [GA]. Although a hangman's noose has long been one of the most chilling representations of racial harassment, two Georgia Power

Vice–Presidents and several managers who were aware of and had even viewed the nooses took no action to remove it. Rather, they allowed it to hang for nearly two years.

Within a few days after the lawsuit was filed GPC undertook an investigation into the Complaint's allegations. This included site investigation of numerous company premises in various locations regarding conduct which might be intimidating or offensive to African–American employees. The investigation did reveal a number of arguable "nooses" hanging or lying in various locations where rope is available for use by GPC's employees. The investigators took statements from employees at those locations to determine what explanation existed and whether the surrounding circumstances suggested an intent to intimidate African–American employees. Photographs were taken and the nooses were removed.

Defendants' investigative memoranda, which are voluminous, are in the record as Plaintiffs' Exhibit 5 to the motion for class certification and have been reviewed by the Court. A photograph of the alleged noose referred to in the Complaint is attached as Exhibit A to the Complaint; other alleged nooses appear in photographs marked as Exhibit 5 of the Appendix filed in support of Plaintiffs' motion for class certification.

Regarding the nooses, the Court notes that GPC's covered employees use rope constantly in their work. In fact, knot tying is a skill taught at GPC's Klondike Training Center. Rope is supplied at GPC's plants and operating centers. Therefore, the fact that rope or knotted rope is found hanging or lying in a GPC facility is itself a fact of no consequence. The important focus is whether, contextually, knotted rope was used or displayed in a manner intended to demean or intimidate African–Americans.

After reviewing Plaintiffs' exhibits, particularly Exhibit 5 and the affidavits of those absent class members who had observed a "noose" on GPC premises, it does appear that at numerous times at various locations knotted rope was present which resembled a noose. These "nooses" did offend and intimi-

date some employees, who attributed a racial significance to the nooses. The sworn statements of Defendants' employees, on the other hand, disavowed any knowledge of racial meaning or racial animus.

The evidence shows generally that various alleged "nooses" were found in GPC's investigation which had been in existence, uncommented-upon by either white or black employees, for long periods of time. In the affidavits of prospective class members presented by Plaintiffs, some affiants commented that they had seen nooses which reminded them of lynchings of blacks in the old South. However, very few of them said that they had pointed this out to management, or for that matter even to other employees. In only two instances did they say that anyone had made any verbal remarks relating the noose to a lynching.

The two incidents in which a Georgia Power supervisor made such a comment about a noose are described as follows. The first reference is in a statement of an employee.

> While working at Georgia Power, I have been subjected to unequal terms and conditions of employment, including being subjected to a racially hostile work environment. For example, while I was working in Dalton, some white employees and I were taking a break and showing each other knots. One white employee, John Armstrong, showed us how to tie a hangman's noose. After telling us the number of loops the knot had to have in order to be legal for executions, he pointed to me and said, "Pete, you probably wouldn't need six loops." I found this comment highly offensive and degrading. He did not make any such remark to any of the white employees. The noose was then hung in the storeroom, and every time through 1988 that my position brought me back to Dalton, I saw it hanging there. None of the other knots was hung in the storeroom.

(Affidavit of Lavern E. Anderson, ¶ 11).

GPC found a noose at its Dalton facility on August 4, 2000 which was hanging "from a metal bar on a rack in the common area of the storeroom." (Plaintiffs Exh. 5, p. 2269).[38] This appears to be the same noose identified in the affidavit of Lavern Anderson. Ralph Magnifier, a white crew leader at the Dalton facility, believed that the noose had been present for ten years. "He did not see the noose as being offensive and had not seen any other symbols that may be considered offensive." *Id.* at 2270.

The other incident occurred at Plant McDonough in 1994 and was recounted by GPC's white male supervisor as follows:

> I went into the control room [at Plant McDonough] to visit the two operators on duty and while in the area found a short length of rope (about six feet). While chatting with the men in the control room, I tied the rope into a hangman's noose, something I learned to do as a kid, being infatuated with Westerns on T.V.
>
> Royce Brown walked into the control room and in my casual nature with my employees, there were comments made in jest about the rope. Mr. Brown left the area and I untied the rope and left it in the area when I departed.
>
> Someone (unknown) contacted me to let me know that [Mr. Brown] was upset about events that occurred in the control room. I recognized that I had made a mistake with one of my employees and made plans to find [Mr. Brown]. I located him on the plant site, within an hour, and made a sincere apology for anything that I might have done in the control room to offend him.

(Plaintiffs' Exh. 5, p. 2104).

Other findings in GPC's investigation were as follows:

Two nooses were found at Defendant GPC's Cornelia facility, one in a storeroom and one in the office of Ken Kirby. In his statement, Kirby stated that he "hung the skeleton/noose on a door several years ago with a no smoking sign attached to it. It was at a time before smoking was prohibited in [GPC] buildings." (Plaintiffs' Exh. 5, p.

---

**38.** This page number refers to the sequential confidentiality number located on each successive page of Plaintiffs' exhibits.

2136). With respect to the noose found in the storeroom, George Chapman stated that "[h]e thinks someone dabbling with rope probably made it one rainy day. He doesn't know who made it or hung it up. He doesn't know of any problems at [Cornelia] of an employee, racial, or discriminatory nature." *Id.* at 2134. Christina Hodges, an African–American customer service representative working at Cornelia, stated that she "[n]ever saw a noose until she saw the picture in the paper. She knows of no problems at [Cornelia]." *Id.* at 2135.

Another "noose" was found by GPC at its Athens facility and was removed by management. (Plaintiffs' Exh. 5, p. 2121). During the investigation, GPC investigator Norman Holle stated that if the noose had not been pointed out to him, "he probably would have never seen it." The noose was located at the top of an 18′ garage door used by large trucks. Three statements were given with respect to this matter. The first statement merely acknowledged the presence of the noose. (Statement of [unidentifiable] Holle; Plaintiffs' Exh. 5, p. 2127). The second statement, provided by Luther Standridge (race not noted) states:

I came to work for Georgia Power in February 1985. I was trained to dielectric test trucks shortly afterwards. The noose was hanging within clear view of where we sat to run the test machine. It was there before I came to work for Georgia Power. I never considered it to be anything racial. I tested trucks with men both black and white and I never heard a comment made about it. I would associate a noose with the old west rather than something racial.

(Plaintiffs' Exh. 5, p. 2128).

The third statement with respect to the Athens noose, provided by Al McKeever (African–American), states:

I, Al McKeever, am a mechanic at the Athens Fleet Services Garage. I have been in the garage for approximately 30 years. I don't know who put the noose on the rail nor do I know exactly when it was put up. It has been there for approximately fifteen years or longer. The noose never bothered me. Since the lawsuit in 72–73 about discrimination, I have not

been threatened, harassed, or intimidated in any way.

(Plaintiffs' Exh. 5, p. 2129).

On August 18, 2000, Dwight E. Stevens conducted an investigation at GPC's Milledgeville Operating Headquarters and found a training rescue mannequin laying in a storeroom which had a 3/8″ polyester rope tied around its neck. (Plaintiffs' Exh. 5, p. 2239). The mannequin is not identifiable as being of a particular race. Paul Morgan, an African–American truck operator working at the Milledgeville facility, stated in his investigative interview that "he had not seen the noose and therefore, was not offended by it. He only saw the end of the rope hanging from the dummy and did not know what the rope terminated into." *Id.* at 2242. Another employee at the Milledgeville facility, J.D. Parker, an African–American employee, provided the following statement regarding the noose:

I have seen the dummy hanging up at the shed with a noose around its neck. I think it was done as a joke because of how heavy it is. It was not done because of race. I have heard that Paul and Jim [unidentified] did it, but I did not see them do it. If you ask me if they did it I would have to say that I think they did but do not know for sure that they did. That thing sure is heavy and needs to go on a diet.

(Plaintiffs' Exh. 5, p. 2261).

GPC also found two possible nooses at its Forest Park location in its investigation. In the first instance, Dan Fleming, a white male, reported a rope tied to a fan in his work area. "Fleming states that this rope had been tied to this fan for, at least, the past six years, during which period he has worked in this area. Fleming told his supervisor, Mark Sanders, about the rope, as a direct result of the heightened issues affecting diversity, and, subsequently Sanders removed the rope." (Plaintiffs' Exh. 5, p. 2175).

The other possible noose was found on the tool box of Preston Owings. Owings stated that "[t]he rope in question, was *not* a noose, but a small piece of nylon rope, knotted twice with a half hitch knot, and used to lift the

end bell of a motor housing, as work conditions required." (Plaintiffs' Exh. 5, p. 2176) (emphasis in original).

Another GPC investigative memo describes an incident in which two employees engaged in "racially insensitive horseplay":

> [a] horseplay incident was conceived by Eddie Dean, a white employee and Brian Hill, a black employee to, apparently cause emotional distress to Richard Mitchell, a white employee. The issue concerned a *mock* racial incident involving a ten year old safety pamphlet, from Dean's toolbox, entitled Facts about Backs which had been changed to read Facts About Blacks. Specifically, Hill pretended to be highly upset at the apparent racial monogram, while Dean appeared to be totally insensitive to Hill's concerns. This charade was carried out over most of a day's work on or around July 5, or 6, 2000.

(Plaintiffs' Exh. 5, p. 2176) (emphasis in original).

Another statement describes the discovery of "some type of voodoo doll that was hanging from a hangman's noose" in the office of Mr. Buddy Phillips, a Caucasian supervisor at the Klondike Training Center. With respect to this "noose," Phillips explained that:

> For his 40th birthday, his children, Marc & Katie, gave him an "old timers doll." He described the doll as being approximately 12″ high, W/M, grey hair sticking out from under a little hat, with a red shirt with writing on it pertaining to getting old. Phillips stated that he took the doll to work with him and put it in his office at the South Atlanta Road TMC. During the time frame 93/94, he came to his office one morning and found the doll hanging from his Venetian blinds by a hangman's noose. He just left it there as he felt that his crews were just trying to get a "rise" out of him. He in no way felt concerned or threatened by the noose. Phillips stated that the whole time the doll was hanging on the blinds, that no one ever made a comment about it.

(Plaintiffs' Exh. 5, p. 2113).

On July 30, 2000, a knotted rope resembling a noose was found lying on the floor in a corner at Plant Scherer. Another rope, with a loop attached to a pole was found nearby. Statements were taken from employees who felt that the nooses were tied by "copycats" after news of the instant lawsuit was announced. (Plaintiffs' Exh. 5, p. 2036). In fact, several individuals alleged that Chuck Quick (a white switch man sampler working for Defendant GPC at Plant Scherer) had stated that "[i]f you really want to get things stirred up, you should place a noose somewhere." (Statements of Kathy Russell, Nathaniel Walkers, Jeff Manuel; Plaintiffs Exh. 5). Julius Seawick, a security officer at Plant Scherer stated "I think [the noose] was a copy cat act because of the recent activities in one of [Defendant GPC's] northern facilities." (Plaintiffs' Exh. 5, p. 2049).

After the "nooses" were found in Defendant GPC's Plant Scherer Facility, a memorandum was sent to all employees at the plant which stated, in part:

> Our company policy concerning conduct states "all employees and agents of the company are expected to conduct themselves in a manner consistent with professionalism, decency, dignity, and respect." Our company policy further states with regard to workplace violence that "acts or threats of physical violence including intimidation, harassment, and/or coercion, which involve or affect the company or which occur on company property, will not be tolerated."
>
> As an example, the production and displaying of a hangman's noose is inconsistent with our policy on conduct and our policy on workplace violence. Any employee engaging in such an act will be subject to discipline up to and including termination.

(Plaintiffs' Exh. 5, p. 2063).

Summarizing the noose testimony, the Court finds that it is impossible to say whether *any* of the nooses were made or displayed out of a desire to offend or intimidate African–American employees. Some of the individuals who made the nooses or were aware of their presence probably knew of the potential for offending or perhaps intimidating African–American employees and perhaps some were insensitive or even callous to

this fact. Others, however, probably never even thought of a racial implication. Taking their statements at face value, some African–Americans were offended or intimidated; others did not think of a racial implication. There is no evidence that any of the Named Plaintiffs were exposed to incidents similar to these.

### d. *Racial Slurs and Jokes*

In 111 affidavits of prospective class members, information is provided as to various racial slurs, epithets, jokes, and harassment. Some of these instances are detailed in the brief filed in support of Plaintiffs' motion for class certification at pages 9–10, footnote 5. Almost all of the 111 affidavits contain some mention of a racist comment.

Defendants do not seek to disprove that the statements were made but point out that within the Defendants' companies there exist working environments at 200 plus locations, such that the affidavits are insufficient to establish the existence of "severe and pervasive conduct that is both subjectively and objectively offensive" as required to establish the existence of a hostile work environment. Defendants also point out that the Named Plaintiffs themselves have experienced little of the conduct or statements referenced in the affidavits, thus undercutting the suggestion that the jokes and slurs represent pervasive conduct. Defendants also point out that they do have channels through which employees can report instances of harassment; also, Defendants point out that their management did respond when the lawsuit was filed.

The Court has reviewed all of the affidavits, and does agree with the Plaintiffs that the statements and conduct referenced therein are unacceptable and that they are demeaning to African–Americans. However, the Defendants are correct that in terms of sheer numbers, given the size of the Defendants' workforce (over 12,000 employees) and

the large number of work locations maintained by Defendants, the instances of racial slurs, epithets, jokes and harassment set out in the affidavits are insufficient to warrant an inference of the existence of a hostile environment common to all locations maintained by all Defendants.[39]

For the same reason, the noose evidence and evidence of racial slurs, jokes [40] and epithets set out in the affidavits are inadequate to establish the existence of a pattern and practice of discrimination.

### e. *Glass Ceiling*

In a further effort to show that the Named Plaintiffs and members of the class share common issues, Plaintiffs argue that the Defendants maintain an "upper glass ceiling" and a "lower glass ceiling" which produce significantly smaller representation of African–Americans in lower, middle and upper management than exists at non-management levels. Defendants do not appear to contest the figures cited in Plaintiffs' brief.

The data provided by Plaintiffs concerning lower representation of African–Americans in management would be relevant to show the effect of discrimination if discrimination in promotions were shown at the management level. This data does not in itself show an intent to discriminate. Also, as previously mentioned, there is no Named Plaintiff who can represent management level employees in promotion or compensation claims.

### f. *Alleged Policy of Ignoring Policies*

Plaintiffs argue that while the Defendants have numerous, detailed written policies and procedures pertaining to filling job vacancies, making promotions, and determining compensation levels, the Defendants' actual policy is "no policy". Plaintiffs base this argument primarily on statements made in a deposition by Mark Wolfe, staffing director

---

**39.** Plaintiffs note in their reply brief, p. 6, n. 4, that they are not seeking certification of a hostile work environment claim. However, they point out, correctly, that the Court can consider this evidence to determine the existence of a pattern and practice of discrimination.

**40.** Plaintiffs' Exhibit 6 is a sheet containing a large number of racist jokes. The Court has

been unable to determine which of Defendants' locations it came from or which employees saw it. Similarly, the cartoon marked as Plaintiffs' Exhibit 7 (hooded KKK figures singing "I'm Dreaming of a White Christmas") is not identified as to which location was involved or which employees saw the cartoon.

*for SCS.* Wolfe testified that SCS promulgated guidelines for GPC, SCS and SCES hiring managers to use. However, he made it clear he had little information concerning the actual application of those policies in the hands of Defendant managers. Basically, he said that SCS promulgated the policies and procedures; the implementation is up to Defendants' managers. In response to various questions by Plaintiffs' counsel, he answered essentially that there was no guarantee that a particular manager would follow the recommended procedure.

Plaintiffs seek to draw too much from the statements made by Wolfe in his deposition. Wolfe did not testify that managers *do* ignore the policies and procedures established by SCS. Wolfe's testimony is more fairly characterized as asserting lack of knowledge. Particularly when the affidavits of Defendants' managers are considered, it is simply incorrect to say that Defendants utilize entirely subjective processes in making promotions, evaluating employees, filling vacancies, or determining compensation. *See* Defendants' Exhibits 28 through 61. It is true that in applying SCS' recommended procedures managers must make discretionary determinations; but the Court cannot see how this could be avoided. Defendants' employees are not assembly line workers. In addition, it is incorrect to suggest that because Defendants' personnel policies do not dictate a particular result in a given case, there is no policy. A fairer interpretation of the evidence would be that Defendants do have numerous written procedures and policies regarding hiring, promotions, evaluations and compensation, that there is some variation in the manner in which various managers use these procedures, and that the policies and procedures were never intended (nor could they be) to dictate particular outcomes in individual cases. These facts do not make the decisionmaking process improperly or unfairly subjective, however.

### g. *Prospective Class Members' Affidavits Establishing Their Own Experiences with Defendants*

Plaintiffs have filed 111 affidavits of prospective class members who recite (in addition to the noose testimony and the racial jokes and slur testimony previously discussed) their efforts to obtain promotions or greater compensation, and their belief that Defendants have discriminated against them in denying them the promotions and compensation they believe they should have.

The affidavits as a whole do establish the belief of the affiants that they have been discriminated against, but it is not possible to determine based only on the affidavits that discriminatory decisions were made in the instances recited. In order to make that determination, the Court would need considerably more detailed information as to each of the recited instances. In the Court's opinion, these affidavits serve to undercut Plaintiffs' position on the issue of commonality.

Ninety-one of the 111 affiants are current or former employees of Defendant GPC. Six individuals are or were employed by Defendant SCES. Twelve stated that they are or were employees of Defendant SCS.

Of the 65 male affiants, 55 hold positions covered by the CBA. Among those 55, three have college degrees. Twenty-five of the 111 total affiants hold degrees from a four-year college.[41] One of the 25, Willie Mathis, holds a degree in engineering.[42]

A representative sampling of the 111 affidavits is as follows. The first three affidavits are from persons who have held or hold management positions with defendants.[43]

Angelin Maines is a former employee of Defendant SCES, where she worked as a

---

**41.** John Muckle, a lineman for Defendant GPC, received a Bachelors Degree in Criminal Justice from Albany State College. Greg Jackson, a security coordinator for Defendant GPC, received a B.A. in Theology from the Florida Theological Seminary. Rickey Bailey, an electrician for Defendant GPC, received a Bachelors Degree in Art from Columbus College.

**42.** Mathis, a former district power marketing executive for Defendant GPC, states that he received a B.S. in Electrical Engineering, Electronics & Communications from Howard University.

**43.** Mathis, Maines and Bowen are the only affiants who held or hold what appear to be "management" positions with Defendants.

project manager. Before her employment with Defendant SCES, Maines obtained a Bachelor of Science Degree in Marketing from American International College in Springfield, Massachusetts. Maines worked for Defendant SCES for five months. She states that "[w]ith respect to job opportunities, [Defendant] prevented me from advancing to the same levels or at the same rates as similarly situated Caucasian employees." (Maines Aff., ¶ 3). Maines also asserts generally that she "[r]eceived lower compensation than similarly situated Caucasians performing the same or similar jobs." *Id.*

Therese Bowen has been employed at Defendant GPC for approximately five years. She is currently an account manager at the Customer Care Center in Henry County, Georgia. Bowen, who received an English degree from Spelman College in Atlanta, Georgia, began working for Defendant GPC as a temporary employee in 1995. Bowen's first permanent position was chief PBX operator in Atlanta, Georgia. Subsequently, she obtained the positions of secretary, worker's compensation representative, and support representative I. In August 2000, Bowen was promoted to her current position of account manager. She states that she has been unable to advance to the same levels or at the same rates as similarly situated Caucasians. Bowen alleges that two non-posted positions, in 1999 and 2000, were awarded to Caucasian employees. Bowen also alleges that she has received low performance scores and that she has been reprimanded for making personal phone calls on account of her race.

Willie Mathis was employed as a district power marketing account executive by Defendant GPC for twenty years before he was terminated in May, 1999. Before his employment with Defendant GPC, Mathis obtained a Bachelor of Science in Electrical Engineering, Electronics & Communications from Howard University in 1976. Mathis complains generally that he was treated unfairly, on the basis of race, with respect to job opportunities, compensation and performance evaluations. Mathis states that five Caucasian employees who were hired at the same time as he received promotions one year before he did. Mathis also alleges that he received lower compensation and lower performance evaluation scores because of his race.

Mack Thomas is currently employed as a lineman for GPC in the operating line department in Carrolton, Georgia. Thomas does not describe his educational background, but states that he began working for Defendant GPC as a utilityman in 1981. In this position, his duties included performing janitorial work and aiding in groundskeeping. (Thomas Aff., ¶ 7). Subsequently, Mack advanced as a helper in 1982, as a truck operator in 1982, and then as a lineman in 1986. Mack states that in 1999 he was twice denied a promotion to a crew leader position in the operating line department. In his affidavit, Mack also states that GPC uses a subjective performance evaluation system in which his manager "is able to inject racial bias" into the evaluation scores. (Mack Aff., ¶ 16).

Norman Wright has been working at Defendant GPC for nineteen years and is currently working as a senior field service representative in Macon, Georgia. Wright, who does not detail his educational background, began working for Defendant in 1981 as a laborer in the opening field department. From 1981 to 1998, he advanced through the following positions: laborer, switchman sampler, laborer in the maintenance department, auxiliary equipment operator, apprentice mechanic, field service representative, helper, and senior field service representative—the position which he obtained in 1997 and currently holds. In his affidavit, Wright contends that, during his career with Defendant GPC, he has been unable to advance to the same levels or at the same rates as similarly situated Caucasians. Specifically, Wright alleges that between 1988 and 1992, he was denied a facilitator position which was awarded to Steve Martin, a white employee.

Anthony Mattox has been working at GPC for approximately sixteen years. He is currently employed as a lineman in Gwinnett County, Georgia. Although he does not describe his educational background, Mattox states that, before his employment with Defendant GPC, he worked for Country Pride and Protein Foods in Gainesville, Georgia on the clean-up crew. At GPC he has held the

following positions: winch truck operator, apprentice lineman and lineman. Mattox states that Defendant GPC's subjective interview and testing policies and practices have kept him from advancing, while allowing whites to "readily advance." (Mattox Aff., ¶ 7). Specifically, Mattox alleges that three Caucasian individuals advanced to the position of crew leader in 1995, 1998, and 2000. Additionally, Mattox contends that he has "received unfair and unequal terms and conditions of employment which have resulted in discrimination in job opportunities." *Id.* at 8. Mattox states that he "believe[s] that [his] Caucasian supervisor, Tom Smith, has unfairly disciplined [Mattox] to keep [him] from advancing within the Company." *Id.* As an example, Mattox contends that he received an oral reprimand on one occasion for making an appointment with a private doctor instead of the company doctor with respect to an on-the-job injury. Mattox contends that a Caucasian employee engaged in similar conduct, but that he was not aware of any verbal reprimand in that instance. Therefore, Mattox concludes that "because my supervisor has unfairly singled me out for disciplinary action because of my race, I have been unable to apply for positions for which I was qualified."[44] *Id.* at 9.

Jesse Nation has been employed by Defendant GPC for approximately 22 years. He is currently employed as a lineman in Austell, Georgia. Nation, who does not detail his educational background, asserts that he has been treated unfairly with respect to job opportunities on account of his race. Nation began working for GPC in 1977 as a member of the line crew (construction & maintenance department). He then advanced as an entry level line helper, a winch truck operator, apprentice lineman, and lineman. Nation asserts that he has been denied promotions through the use of "moving goalposts." Specifically, Nation complains that the company takes other factors, such as test scores, education, and interview results, into promotion considerations other than seniority. Nation contends that if Defendant GPC used seniority as the sole determinant in awarding promotions, he would have obtained the position of foreman in 2000. Instead, Nation states

that "because the Company relies on subjective interviews and tests to determine promotions to foreman positions, [he] was denied the job." (Nation Aff., ¶ 11).

Wilhemina Pierce worked for GPC as an administrative support in the billing services department in McDonough, Georgia for approximately eighteen months. Pierce held this position until September 26, 2000 when she resigned. Pierce, who states that she is currently enrolled at Atlanta Technical College, began her employment at GPC as a collection specialist. She states she was treated unfairly with respect to training opportunities because of her race. (Pierce Aff., ¶ 7). Pierce alleges that she was refused proper classroom training with respect to her position as timekeeper. Pierce also alleges that she was subjected to a racially hostile environment during her employment at Defendant GPC. In support of this claim, Pierce states only that she was not afforded the opportunity to participate in meetings related to her position. (Pierce Aff., ¶¶ 11–12). No other detail is provided.

Yolanda L. Roberson is a former employee of Defendant SCS. Roberson, who holds a biology degree from Dennison University, was employed by Defendant SCS as a customer service representative for approximately 23 months. Roberson asserts that she quit her employment because "the stress of race discrimination had become too great." In her affidavit, Roberson contends that she was treated unfairly because of her race with respect to job opportunities and subjected to a racially hostile environment. In her brief employment with Defendant, Roberson alleges that she applied for the positions of technical support, billing analyst, team leader, and dealer coordinator. These positions, according to Roberson, were awarded to Caucasian employees who were less qualified than she. Roberson also alleges that she was discriminated against with respect to compensation and performance evaluations.

Anthony Hagan has been working for Defendant GPC for approximately 28 years. Hagan, who does not describe his educational

---

44. Mattox makes this contention as it is Defendant GPC's policy to prohibit an employee from seeking a promotion while currently on active discipline.

background, began working for GPC as a laborer in 1972. Subsequently, he obtained the positions of helper, winch truck operator, light equipment operator, serviceman C, serviceman A, and special service representative. In December, 1991, Hagan obtained the position of Investigator I, a position which he currently holds. In his affidavit, Hagan states that, during his employment with Defendant GPC, he has been treated unfairly because of his race with respect to job opportunities. As support for this contention, Hagan states that a Caucasian coworker was awarded the position of meter foreman for which Hagan had previously expressed interest. Hagan maintains that this job opening was never posted.

Lillie O. Haley was employed by Defendant GPC for approximately four years before voluntarily leaving the company in December, 1998. (Haley Aff., ¶ 2). In her affidavit, Haley states that, during her employment she "was treated unfairly because of [her] race with respect to job opportunities, compensation, and the terms and conditions of [her] employment." *Id.* at 3. Haley, who received an associate degree in accounting from the Atlanta Business College in 1977, began working for GPC in 1994 as a Teleservice Representative in the Marketing Department at the Ralph McGill office in Atlanta, Georgia. In 1996, she was transferred to a temporary full-time position as an energy advisor. In March, 1997, she was transferred to another temporary full-time position as a residential & sales field representative. After concluding that Defendant GPC would "[n]ever let [her] advance because of [her] race," Haley quit in December of 1998. *Id.* at 19. In her affidavit, Haley complains that she was not offered a permanent full-time position on the basis of her race. Haley states that when she inquired as to why she was not chosen for a specific position, her manager informed her that her lack of a certain skill or attribute was the deciding factor. Haley also states that new, permanent full-time Caucasian employees received a higher rate compensation. This discrepancy, according to Haley, was based on her race. *Id.* at 13.

Kimberly Turner was employed with Defendant SCS as a computer operator I in Atlanta, Georgia for approximately three years. Turner was fired in January, 2000. In her affidavit, Turner asserts that her termination was as a result of racial discrimination in disciplinary action. Specifically, she states that "on January 12, 2000, I was terminated for sending an e-mail to another employee by mistake." In her affidavit, Turner states that Marcia Schultz, a Caucasian employee who engaged in similar conduct was disciplined less harshly. Turner states that Schultz allowed her boyfriend, a former employee, to use her computer. (Turner Aff., ¶ 15). As a result Schultz was given a two week suspension. Although Turner does not describe the content of the e-mail which she was disciplined for sending, Named Plaintiff McCullers stated in her deposition testimony that Turner was fired for sending a pornographic video and/or pornographic photograph to members of upper level management and "[a]ll over, in different parts of the Company." (McCullers Depo., p. 60).

Howard Harden, III has been employed by Defendant GPC for approximately 22 years. Harden received a B.A. in Divinity from Lahario Bible Institute in Augusta, Georgia. Harden alleges that he has been treated unfairly because of his race with respect to job opportunities and been subjected to a racially hostile environment. (Harden Aff., ¶ 3). Harden's first position at GPC was lineman helper. In 1979, Harden was promoted to the position of field service representative in Augusta, Georgia, a position which he currently holds. Harden states that he has applied for and been denied several promotions for which he was qualified. For instance, Harden applied for the position of meterman C for which he was required to take a test. Harden failed the test and the position was awarded to another individual with less seniority. *Id.* at 8. Harden also states that he has been subjected to a racially hostile environment. In support of this allegation, Harden states that Defendant GPC sued him because he lost a $30 sealing iron and required him to take a day off without pay in order to compensate his employer for losing a piece of their equipment. Harden contends that several Caucasian co-

workers have lost equipment and not been sued.

Bobby Couch is a current employee of Defendant GPC where he has been working for 27 years. Couch received a Technical Degree in Automotive Mechanics from Coosa Valley Technical School in Rome, Georgia in 1969. Couch accepted a job with Defendant GPC in 1973 as a "C" Class Mechanic at the Rome Division. In 1975, Couch obtained the position of "B" class mechanic based on his seniority. In 1982, Couch was promoted to the position of journeyman mechanic, which he currently holds. In his affidavit, Couch asserts that he has been treated unfairly because of his race with respect to job opportunities and been subjected to a racially hostile work environment. Specifically, Couch contends that he has applied for and been denied several promotions, including crew leader, for which he feels he was qualified.

Willie Geter has worked for Defendant GPC for fifteen years. Geter, who does not disclose his educational background in his declaration, is currently employed as a fork lift driver in Newnan, Georgia. Geter asserts that he has been treated unfairly because of his race with respect to job opportunities. Geter also states that he has been subject to a racially hostile environment. (Geter Decl., ¶ 3). From 1979 to 1989, he held the positions of laborer, meter reader, and senior meter reader. *Id.* at ¶ 10. Geter states that, in 1993, he applied for the lead man position of senior service representatives in the meter reading department, but that the position was awarded to a Caucasian employee with less experience.

Jackie Edwards, who is currently working as a mechanic in the maintenance department in Cartersville, Georgia, has been employed by GPC for approximately thirty years. Edwards, who does not describe his educational background, asserts that he has been treated unfairly because of his race with respect to job opportunities. Edwards also states that he has been subject to a racially hostile environment. In his affidavit, Edwards contends that he has applied for and been denied promotions for which he was qualified. Specifically, Edwards states that in 1999 and 2000, he applied four separate times for promotion to the storekeeper position. "In many cases," Edwards alleges, "[Defendant GPC] awards these positions to less qualified Caucasian employees." (Edwards Aff., ¶ 10). In support of his assertion that he has been subjected to a racially hostile environment, Edwards alleges that his co-workers have posted Confederate insignias such as the "Rebel Flag" in the workplace.

Paul Jackson has been working for Defendant GPC for approximately twenty years and is currently employed as a customer service representative at the Metro Customer Service Center in McDonough, Georgia. Jackson, who obtained an Associate degree in Business Administration from Atlanta Metropolitan College in 1979, began his career with GPC in 1980 as a customer service representative C. Six months later, he was promoted to customer service representative B. In 1980, Jackson obtained the position of customer service representative A, a position which he still holds. In his affidavit, Jackson states that he has been treated unfairly because of his race with respect to job opportunities and discipline. (Jackson Aff., ¶ 7). Specifically, in 1998 Jackson was absent from a class which he was required to attend. As a result, he was placed on the second level of positive discipline for his absence. However, Jackson states that, "on countless occasions," when a Caucasian employee was absent from a mandatory meeting, "the employee conducting the class would generally phone or go to that employee's work area and request that they join the meeting." *Id.* at 7. However, Jackson asserts that, because of his race, he was "not afforded a reminder that the meeting was taking place." *Id.* Because of his disciplinary record, Jackson was unable to apply for a promotion to the metro customer service expert group. Jackson also maintains, without citing a specific example, that he has received unfairly low performance evaluation scores because of his race. *Id.* at 9.

Summarizing, 111 prospective class members have filed affidavits which evidence their belief that Defendants have treated them unfairly on account of their race. Because the Court has no other information

concerning the details of these complaints, it is not possible to even estimate whether all, some or none of the affiants' complaints are valid. The Court does observe that while most of the allegations are rather general, resolving the validity of each claim would be a fact-intensive process. Also, while the existence of even one valid claim would be too many, at the same time 111 affiants out of a group of 2400 individuals is too low a proportion to prove a pattern and practice of discrimination.

### h. *Indifference of Senior Management*

Finally, Plaintiffs argue that the indifference of Defendants' senior management to race discrimination supplies an element of commonality sufficient to warrant a determination that the Named Plaintiffs and all prospective class members have been adversely affected in a discriminatory fashion.

Ironically, this section of Plaintiffs' brief points out that in response to findings of the Office of Federal Contract Compliance in 1994, GPC agreed to implement new procedures including the JobNet system, the structured interview guidelines, use of selection committees, and use of external recruitment and candidate services. Because the changes implemented did not produce the result of closing the salary and promotion gap between Caucasians and African–Americans, and because the Defendants' own self-study ("The Diversity Report Card") was critical of the extent of improvement, and because of the inability of Defendants' top representatives to answer certain deposition questions, Plaintiffs argue that the indifference of senior management is at such a level that the Court should find a common thread of "indifference" to define a cohesive class. It seems to the Court that Plaintiffs overreach in this argument.

### i. *Legal Discussion and Conclusion*

The controlling case law interpreting Rule 23's requirement of commonality in employment discrimination cases is set forth in *Gen-*

*eral Telephone Company of the Southwest v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), plus several decisions of the United States Court of Appeals for the Eleventh Circuit, *Nelson v. United States Steel Corp.,* 709 F.2d 675 (11th Cir.1983), *Griffin v. Dugger,* 823 F.2d 1476 (11th Cir. 1987), and *Washington v. Brown & Williamson Tobacco Corp.,* 959 F.2d 1566 (11th Cir. 1992).

In *Falcon,* the Supreme Court reversed a lower court ruling that allowed plaintiff, who alleged he had been denied a promotion on account of his national origin, to maintain a class action on behalf of all Mexican–American applicants for employment without identifying questions of law or fact common to the claim of the plaintiff and that of the class members. The Supreme Court noted that plaintiff had a meritorious promotion claim, but it held that this did not entitle him to represent class members who had hiring claims when plaintiff had failed to make a factual showing on the issue of commonality. The Court referred critically to the "across the board" rule which had previously allowed a victim of race discrimination to attack all unequal unemployment practices committed by an employer, regardless of whether plaintiff himself had been injured by such practices, referring in particular to *Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122 (5th Cir.1969).[45]

*Falcon* did leave open a window of opportunity for plaintiffs seeking certification, however:

> If petitioner used a *biased testing procedure* to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test clearly would satisfy the commonality and typicality requirements of Rule 23(a). *Significant proof that an employer operated under a general policy of discrimination* conceivably could justify a class of both applicants and employees if

---

**45.** The Supreme Court quoted with approval Judge Godbold's specially concurring opinion in *Johnson,* wherein Judge Godbold expressed concern about potential unfairness to class members bound by an adverse judgment if the class definition was overly broad. Judge Godbold warned courts not to assume that "all will be well for surely the plaintiff will win and manna will fall on all members of the class." *Johnson* at 1127.

the discrimination manifested itself in hiring and promotion practices in the same general fashion, *such as through entirely subjective decisionmaking processes.* In this regard it is noteworthy that Title VII prohibits discriminatory employment *practices,* not an abstract policy of discrimination. The mere fact that an aggrieved private plaintiff is a member of an identifiable class of persons of the same face or national origin is insufficient to establish his standing to litigate on their behalf all possible claim of discrimination against a common employer.

*Falcon,* 457 U.S. at 159, n. 15, 102 S.Ct. 2364 (Emphasis supplied).

In *Nelson,* the Court of Appeals affirmed the trial court's holding that commonality had not been established where the plaintiff had not established that the discrimination she allegedly suffered was "typical or relatedly, that a policy of race discrimination pervaded U.S. Steel's hiring practices." *Id.* at 679. The Court noted in footnote 9:

The plaintiff's task in establishing the requisite commonality or typicality is more difficult where, as here, disparate treatment is alleged. Disparate impact cases typically involve readily identified, objectively applied employment practices such as testing procedures. The common reach of such practices is likely to be clearer and easier to establish than a general policy of race discrimination alleged to unite otherwise factually dissimilar disparate treatment claims. (Footnotes omitted).

*Significant proof that an employer operated under a general policy of discrimination conceivably could justify a[n] across the board class* of both applicants and employees if the discrimination manifests itself in hiring and promotion practices in the same general fashion, *such as through entirely subjective decisionmaking processes.* (Footnote omitted) (emphasis supplied).

The Court of Appeals found that while the plaintiff had alleged a general policy of race discrimination, she had produced no reliable evidence to back up that claim. Therefore, the suit would degenerate into a series of mini-trials, which would be contrary to Rule 23's goal of judicial economy.

In *Griffin v. Dugger,* 823 F.2d 1476 (11th Cir.1987), the Court of Appeals vacated a district court order certifying a class, finding in part that the commonality requirement of Rule 23 had not been met when plaintiff, a rejected applicant for a clerical position, sought to represent those who had failed to pass a test required for another position and neither of the *Falcon* exceptions was met.

In *Washington v. Brown & Williamson Tobacco Corp.,* 959 F.2d 1566 (11th Cir.1992), the Court of Appeals affirmed the trial court's denial of class certification, finding that plaintiffs were seeking certification of a class "challenging every employer practice with respect to that class", *id.* at 1570, and finding that plaintiff had not established that anything other than race was common to their claims.

While Plaintiffs may intend for individual Named Plaintiffs to represent different subgroups within the prospective class, neither the Complaint nor the motion for class certification spells out the parameters of each Named Plaintiff's representative capacity with respect to any subgroup. It is not obvious how, or whether, individual Named Plaintiffs could appropriately represent particular subgroups. Thus, the Court considers that for all intents and purposes this is an "across the board" case which does not meet Rule 23's commonality requirement unless one of the *Falcon* exceptions recognized by the Supreme Court is met.

Plaintiffs have made vigorous efforts to establish a pattern and practice of discrimination or a disparate impact, either of which would establish essentially a presumption of discrimination affecting the entire class. Even when Plaintiffs' pattern and practice evidence is considered as a whole, however, it is not enough to convince the Court that race discrimination is Defendants' "standard operating procedure" as defined by *Teamsters.* Plaintiffs' evidence is insufficient in quantity and quality to make this determination, given the size and geographic scope of the Defendants' operations and the large number of employees who work for Defendants.

Similarly, Plaintiffs' efforts to establish that Defendants have an "entirely subjective hiring, promotion and compensation process" falls short. Plaintiffs' evidence does show that Defendants' managers exercise discretion in these areas, but that is different from an "entirely subjective decisionmaking process." Finally, Plaintiffs' statistical evidence regarding the existence of an adverse impact is unconvincing. For one thing, the evidence does not show proof of a convincing nexus between the claimed policies and the outcome due to its failure to adequately measure the treatment of similarly situated individuals. Secondly, the extent of adverse outcome is not proven with convincing force by the expert testimony for the same reason.

The Court recognizes the enormity of the task borne by Plaintiffs to prove pattern and practice or adverse impact; however, the size of the burden is proportional to the task chosen by the very wide-ranging nature of this lawsuit.

### C. *Adequacy of Representation*

For the reasons previously discussed, the Court does not believe that the Named Plaintiffs adequately represent the absent class members. The Court does find that Plaintiffs' counsel are capable and experienced lawyers who would more than adequately represent the class, were a class certified.

### 2. Rule 23(b)(2)

█ Under Rule 23(b)(2), the Court may certify a class when the requirements of Rule 23(a) are met and, in addition, the Court determines that the Defendant "has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Rule 23(b)(2), Fed.R.Civ.P.

When a class is certified under Rule 23(b)(2), the outcome of the litigation binds all members of the class, regardless of whether the outcome is favorable or unfavorable. Class members have no right to "opt out". *See* Rule 23(c)(3). Under controlling precedent, back pay is considered equitable relief and therefore can be awarded to class members in a case certified under Rule 23(b)(2). *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 257 (5th Cir.1974). The added wrinkle here, however, is that Plaintiffs also seek compensatory and punitive damages—neither of which were available under Title VII when *Pettway* was decided, and both of which are classic forms of legal—not equitable—relief.

In *Murray v. Auslander,* 244 F.3d 807, 812 (11th Cir.2001), the Court of Appeals held that damages can only be awarded in a (b)(2) case where the damages sought are "incidental" to the claims for injunctive and equitable relief. Such "incidental damages" would be those group damages inherent in a finding of Defendants' liability to the Plaintiffs' class as a whole.

Following *Murray,* the Court finds this case cannot be certified under Rule 23(b)(2). Plaintiffs seek not only back pay, but also compensatory damages and punitive damages which would require highly individualized fact findings and which could not be termed merely incidental to an injunction or declaration in the class's favor.

█ As an alternative, Plaintiffs ask the Court to certify the equitable and legal claims of the class under Rule 23(b)(2), but to allow opt-outs regarding damages claims. Plaintiffs note that this Circuit has recognized the discretionary power of the district court to allow opt-outs in a 23(b)(2) case when "desirable to protect the interests of absent class members." *See Penson v. Terminal Transport Co.,* 634 F.2d 989, 994 (5th Cir.1981 Unit B). Also, in *Holmes v. Continental Can Co.,* 706 F.2d 1144 (11th Cir. 1983), the United States Court of Appeals for the Eleventh Circuit held that the district court had abused its discretion by refusing to approve an opt-out procedure in a 23(b)(2) case which had been settled for a payment of an aggregate sum to the class as a whole. The Court of Appeals' stated rationale was that even though the class had been certified under Rule 23(b)(2), it actually was "functionally more similar" to a Rule 23(b)(3) case. *Id.* at 1154.

In the Court's opinion, neither *Penson* nor *Holmes* entitles the Plaintiffs to 23(b)(2) certification of damages claims with an opt-out

feature for compensatory damages claims. *Penson* merely stands for the proposition that a district court had discretion to allow opt-outs in a case involving claims for back pay as well as injunctive relief. No compensatory damages claims were involved. *Holmes,* which also did not involve compensatory damages, was a case which had been settled. The Court of Appeals noted that in the settlement posture, the case was more like a 23(b)(3) case in which common issues predominated. Most importantly, these cases predate the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071 (1991), which added the right to seek compensatory and punitive damages and the right to jury trial in cases where these damages are sought.

Assuming that the Court does have the discretion to certify a class under Rule 23(b)(2) for both injunctive relief and damages, with individual opt-out rights as to damages claims, it would decline to do so. As stated elsewhere, individualized issues predominate in this case to such an extent that management of the case would be exceptionally difficult.

Plaintiffs next argue that issues affecting money damages do not predominate over issues of injunctive and declaratory relief because the latter forms of relief are more meaningful to the class. No express predominance requirement appears in Rule 23(b)(2), though the Advisory Committee Notes state that "the subdivision [(b)(2)] does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." Adv. Comm. Notes, 1966 Amendments, Fed. R.Civ.P. 23. Plaintiffs argue that while the Notes are not legally binding, a policy of liberal interpretation of civil rights law favors a reverse inference that money damages can be collected by a(b)(2) class so long as money damages are not the predominant form of relief. Plaintiffs argue here that money damages do not predominate because the proposed injunctive/declaratory relief—seeking programmatic changes in Defendants' personnel policies—is more important in the long run than individual monetary awards.

This argument, however, fails on three points. First, there is no binding precedent supporting Plaintiffs' "balancing" approach to (b)(2) certification in the Eleventh Circuit. In fact, the Eleventh Circuit has held specifically that in cases where the money damages are not a purely "group remedy," the damages claims do not predominate over any injunctive relief sought by the class. *Murray,* 244 F.3d at 812. The Court notes that in the *Murray* case the Eleventh Circuit did not evaluate the "importance" of one type of relief over the other. Rather, the Court found that the simple fact that plaintiffs sought individual monetary relief prevented certification.

Secondly, Plaintiffs have given the court little information as to what sort of injunctive or declaratory relief would be of such clear importance as to warrant a determination that equitable issues predominate over issues of damages. Plaintiffs merely state in the Complaint that they seek entry of an injunctive order "to end Defendants' discriminatory practices and to prevent current and future harm to the Named Plaintiffs and the class", and of a declaratory order "that Defendants' acts and practices as set forth herein are in violation of the laws of the United States." Third Amended Complaint, p. 59. It does not seem, however that orders which merely reiterate general existing legal principles would be of the level of significance urged by Plaintiffs. Also, while Plaintiffs' briefs refer to needed "programmatic changes", it is not clear what discrete changes Plaintiffs have in mind which could be directed in a clear, enforceable order. Thus, the record in its present state does not convey why injunctive or declaratory relief would be of more value than money damages to prospective class members, assuming this were a legitimate consideration.

Finally, to some members of the prospective class (especially those who no longer work for Defendants), the injunctive and declaratory relief may be of far less importance than monetary damages.

For the foregoing reasons, the Court does not find that the sought-after injunctive/declaratory relief is of greater value or importance than the sought-after monetary relief.

Further, the Court believes that such a balancing approach is inherently subjective, and in the absence of binding precedent requiring such an approach, the Court would be disinclined to use it.

Since a jury trial has been demanded in this case, the parties are entitled under the Seventh Amendment of the U.S. Constitution to have all factual legal issues determined by a single jury before decisions on equitable matters are made by the Court. *Ross v. Bernhard,* 396 U.S. 531, 538–39, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). The authorities relied upon by Plaintiffs to argue that claims for compensatory damages can be tried in an employment discrimination case certified under (b)(2), with findings on damages deferred until resolution of liability are not applicable and are not workable. Unlike the situation which predated the 1991 Act, the Court cannot conduct a bench trial on pattern and practice or disparate impact issues without a jury where a jury is demanded. Also, if these issues were resolved adversely to the Defendants, it would then be necessary for the jury to hear and rule on all individual claims for compensatory and punitive damages. The prospect of trying possibly two thousand of these claims before a single jury is simply absurd.

### 3. Rule 23(b)(3)

■ The Court also finds that class certification is inappropriate under Rule 23(b)(3). The two essential requirements of Rule 23(b)(3) are that the common questions "predominate over any questions affecting only individual members" and that the class action procedure be "superior ... for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). "In other words, 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof.'" *Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999, 1005 (11th Cir.1997)(citing *Kerr v. City of West Palm*

*Beach,* 875 F.2d 1546, 1557–58 (11th Cir.1989)(quoting *Nichols v. Mobile Bd. Of Realtors, Inc.,* 675 F.2d 671, 676 (5th Cir. Unit B 1982))).[46] The predominance inquiry under Rule 23(b)(3) is "far more demanding than Rule 23(a)'s commonality requirement." *Id.* (quoting *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 624, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)).

■ In *Jackson,* the Eleventh Circuit found an abuse of discretion in a district court's decision to certify a class alleging a nationwide racially discriminatory practice of renting vacant rooms and providing housekeeping services. Plaintiffs argued that the issue whether defendant Motel 6 had a practice or policy of discriminating against patrons and employees on the basis of race predominated over individual issues. *Jackson,* 130 F.3d at 1005. The district court had agreed with the plaintiffs and found that class resolution would be more efficient and cost-effective. Reversing the district court, however, the Eleventh Circuit noted that the "plaintiffs' claims will require distinctly case-specific inquiries into the facts surrounding each alleged incident of discrimination." *Id.* at 1006. Thus, the Court found that most of the plaintiffs' claims would stand or fall on the case-specific issues, rather than a finding of a pattern or practice of discrimination.

Similarly, in *Rutstein v. Avis Rent–A–Car Systems, Inc.,* 211 F.3d at 1235–36 (11th Cir.2000), the Eleventh Circuit Court of Appeals reaffirmed its holding in *Jackson* and emphasized the need for singularity of claims in the class action context.[47] Because there were too many "individualized issues, relative to the one common issue of whether [Defendant] maintains a policy or practice of discrimination," the Court found that the plaintiffs failed to meet the "predomination" requirement of Rule 23(b)(3) and therefore could not proceed as a class with their claims arising under Section 1981. *Id.* at 1235.

---

**46.** In *Stein v. Reynolds Sec., Inc.,* 667 F.2d 33, 34 (11th Cir.1982), the Eleventh Circuit adopted as binding precedent decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981.

**47.** The Court notes that *Rutstein* was not an employment discrimination case, but its reasoning is relevant to the instant case. *Id.* at 1239.

In the present case, Plaintiffs seek certification in part modeled after the United States Supreme Court's decision in the *Teamsters* decision, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), in which the Court found that the question of whether defendants have engaged in a pattern and practice of discrimination is a critical factor which may connect the claims of class members.[48] *Id.* at 336–39, 97 S.Ct. 1843. However, the pattern and practice standard described in *Teamsters* is not met in the instant case. The *Rutstein* Court noted that the *Teamsters* rationale was appropriate where the "[n]umber of African–American and Spanish-surnamed persons hired for line driver positions approached the 'inexorable zero' " or where " 'in the 37 years preceding the institution of the lawsuit the employer did not have a single black [person] on its payroll.' " *Rutstein,* 211 F.3d at 1236–37 (quoting *Teamsters,* 431 U.S. at 342, n. 23, 97 S.Ct. 1843, and *Paradise v. Prescott,* 767 F.2d 1514, 1529 (11th Cir.1985)); *compare Reynolds v. Roberts,* 202 F.3d 1303, 1319 n. 27 (11th Cir.2000)("[I]t is undisputed that [defendant] hired thousands of blacks" and promoted many of these individuals to higher positions. "In light of this, there can be no inference that [defendant's] policies and practices injured every member of the plaintiff classes by discriminating against him or her on account of race.").

Ultimately, the Court in *Rutstein* concluded that, in any class action context, "[S]erious drawbacks to the maintenance of a class action are presented where initial determinations, such as the issue of liability vel non, turn upon highly individualized facts." quoting *McCarthy v. Kleindienst,* 741 F.2d 1406, 1412 (D.C.Cir.1984); *see Andrews v. American Telephone & Telegraph Co.,* 95 F.3d 1014, 1024 (11th Cir.1996)(in action against telephone companies' provision of 900–number services in which plaintiffs claimed, inter alia, that companies were violating gambling laws, Court held that "aspects of each 900–number program will have to be individually examined to determine whether a particular

program actually involves gambling or runs afoul of state gaming laws").

Similarly, as previously discussed, Plaintiffs rely on statistical evidence to provide over-arching proof of discrimination which would connect class members' claims. However, because of limitations in Plaintiffs' proof, the statistical evidence is insufficient to show that Defendants' personnel policies disparately impacted the Plaintiff class, or that Defendants had a general policy of discrimination.

Even if Plaintiffs' pattern and practice or disparate impact theories were viable, however, the Court does not believe that certification under Rule 23(b)(3) would be appropriate. The factual detail needed to determine both liability and individual damages claims for perhaps 2000 individuals would overwhelm the common elements of proof.

Plaintiffs assert that "[c]lass treatment of this controversy is clearly superior to resolution through the filing of a host of individual actions." (Plaintiffs' Brief, p. 58). The Court finds that class certification in the instant case, however, would lead to an unmanageable and fragmented series of individual claims. Defendants contend, and the Court agrees, that severing claims or bifurcating liability and damages, as Plaintiffs suggest, will not solve these unique problems. Instead, as noted above, such individual claims will ultimately turn on the particular facts and circumstances of each prospective class member's claims, including whether the individual was subjected to the alleged disparate treatment or unlawful harassment as well as a calculation of individualized damages with respect to these divergent claims.

In this case, the manageability concerns associated with the individualized nature of the prospective class outweigh any benefit attained from class action litigation as prescribed by Rule 23 of the Federal Rules of Civil Procedure. As such, the Court finds that class treatment is not appropriate.

48. The Teamsters case did not involve class certification under Rule 23, but instead involved a statutory procedure allowing the Attorney General to bring a civil action alleging violations of Title VII. *Teamsters,* 431 U.S. at 328, 97 S.Ct. 1843.

### 4. Hybrid Claim

Plaintiffs also suggest, as an alternative, that the court certify claims for equitable relief under (b)(2) and claims for damages under (b)(3). This variation, however, adds no new options to those already discussed. The fact is that common elements of proof would not predominate in any event so as to meet the requirements of (b)(3).

## VIII. SUMMARY

Because neither the requirements of Rule 23(a) or (b) are met, Plaintiffs' motion for class certification [# 116] is hereby DENIED. Plaintiffs' request for an evidentiary hearing on the certification issues is also DENIED. Plaintiffs' motion to strike the report of Dr. Ronald Sims [# 138–1] and Defendants' motion to strike the second report of Dr. Madden [# 143] are DENIED.